Argued at Pendleton May 1, affirmed June 27, 1922, argued on
rehearing January 2, reversed April 10, rehearing denied and
motion to retax costs denied May 15, 1923.

# HARVEY ET AL. *v.* CAMPBELL ET AL.

### (209 Pac. 107; 214 Pac. 348.)

**Deeds—Intention of Parties Plainly Expressed will Control Construction.**

1. In construing a deed, the intention of the parties is to be
pursued, if possible (Section 716, Or. L.), and, if the expressed
meaning is plain on the face of the deed, it will control.

**Waters and Watercourses—Deed to Water Right "as Defined and Measured by State Water Board" to be Construed in Connection With Findings and Adjudication of Water Board.**

2. A deed conveying land and also eighty inches of water measured under six-inch pressure of a named water right, "as such water
right is defined and measured by the State Water Board of Control of the State of Oregon, in its findings and adjudication" of
rights of various claimants of the waters of Powder River, and also
a *pro rata* interest of 250 inches of water allowed to a named
irrigation company, under its appropriation through such ditch, in
the discretion of the water-master, to cover seepage and transit
loss, *held* indefinite and uncertain, and must be read in connection
with the findings and adjudication of the water board when construing it.

**Waters and Watercourses—Deed Construed not to Require Delivery of One-half Inch of Water Regardless of Quantity in Ditch or Available and of Capital Stock Held by Different Stockholders.**

3. Parties' voluntary acts *held* to evidence such a meaning that
deed cannot be construed as granting the full or maximum quantity
of one-half inch per acre to be delivered, regardless of the quantity
flowing in the ditch or quantity available or of the number of
shares held by the different stockholders.

**Waters and Watercourses—Deed to Irrigated Land Held to Provide for Diverting of Maximum Quantity When the Ditches Should have Been Perfected, and not to Require Grantor to Furnish Water from His Private Ditches.**

4. A deed to land including water rights construed with the findings of the State Water Board referred to disclosing that the irrigation company's rights were inchoate, *held* to grant a right to divert from the named ditch a maximum quantity of eighty inches
when said system shall have been perfected and said ditch repaired
and improved, and does not mean that such quantity is to be furnished by grantor from his private ditches.

### ON REHEARING.

**Waters and Watercourses—Answer Held Insufficient to Raise Issue of Mistake in Deed.**

5. Answer in suit to establish right to a certain amount of
water, as conveyed by a deed, which, after alleging that at time

of purchase it was understood and agreed that sale was of only a proportional part of the water available under water right previously decreed, alleged that, if the deed does not in fact express said understanding, such failure is the result of a mutual mistake, *held* insufficient to raise a question of mistake.

### Waters and Watercourses—Evidence Held Insufficient to Raise Issue of Mistake in Deed.

6. Defendant's evidence is insufficient to raise the issue of mistake, he admitting that his deed used the words intended, while contending that it was understood that only a proportional amount of the water available was sold, and that under the circumstances this was the effect of the deed.

### Waters and Watercourses—Deed Held to be of a Definite, and not a Proportional Amount of Water.

7. Though the circumstances of the parties be considered, as authorized by Section 717, Or. L., a deed of a certain part of grantor's tract having irrigation water rights, and "also 80 inches of water * * of that certain water right taken out of * * the S. ditch, * * as such right is defined and measured by the state water board * * in its findings and adjudication, * * also a *pro rata* interest" in 250 inches allowed to the S. Irrigation Company in the discretion of the water-master to cover seepage, to have and to hold said premises with their appurtenances, with a covenant that the grantor is the owner in fee simple of said "premises," and will warrant and defend the title to the property conveyed, *held* to convey eighty inches of the grantor's water, and not merely a part of the water coming to him proportional to the part of the land conveyed.

From Baker: GUSTAV ANDERSON, Judge.

In Banc.

This is a suit brought by Mary C. Harvey and S. S. Wheeler against Floyd J. Campbell and a corporation known as the Sparta Irrigation Company. The controversy relates to the use of water for irrigation. The dispute results from a difference between the parties in the construction placed upon a deed executed and delivered by Floyd J. Campbell to Mary C. Harvey. A ditch known as the Sparta ditch carried water from the west fork of Eagle Creek, a tributary of Powder River, for a distance of about thirty miles to some arid lands aggregating about 1,500 acres and owned by five or six different persons. On July 30, 1917, Robert N. Warnock

owned approximately 760 acres of this body of 1,500 acres of arid land. The land held by Warnock was conveyed according to legal subdivisions and if the subdivisions included the exact acreage of a perfect subdivision then Warnock owned exactly 760 acres. At any rate on July 30, 1917, Warnock conveyed to Floyd J. Campbell all the land owned by him and

"also that certain water right to the amount of 376½ miners inches of water, measured under six inch pressure, taken out of what is known as the Sparta Ditch in Baker County, Oregon, as such water right is measured and defined by the State Water Board of the State of Oregon, on the 17th day of November, 1915, in its findings of fact and adjudication of the rights of the various claimants to the waters of Powder River; and also a pro rata share of not to exceed 250 miners inches of water allowed in said decree in the discretion of the Water-master for and on account of seepage, all in the County of Baker and State of Oregon."

Campbell had not had any experience with irrigated land, and he made this fact known to Wheeler, who had had much experience in irrigation, with the result that an agreement was made whereby Wheeler and his wife were to move upon the land, and Wheeler was to act as overseer for a fixed monthly sum; and, accordingly, on August 13, 1917, Wheeler and his wife moved upon the premises. After Wheeler and his wife had been there "a couple of weeks" Mrs. Wheeler wrote to her sisters, Mary C. Harvey and Mrs. Flora Dunne, and invited them to come and visit with her and her husband; and in response to the invitation the two sisters came to visit with the Wheelers, arriving at the Campbell ranch in September.

Campbell had made it known to Wheeler that he wished to sell some of the land, and Campbell had told Wheeler that he would give him a commission of $5 per acre if Wheeler would assist in selling a portion of the land. Wheeler told Campbell that he had in mind certain persons as prospective purchasers and thought that he could interest them in the land, but after some correspondence with those persons Wheeler ascertained that they were not interested. After the arrival of Mary C. Harvey and Mrs. Dunne they became interested and Mary C. Harvey purchased a tract of 160 acres, and it is appropriate to explain also that Mrs. Dunne purchased a portion of the Campbell land. The deed from Campbell and wife to Mary C. Harvey was dated October 8, 1917, and it conveyed to the grantee 160 acres of land, described as the W. ½ of the SE. ¼ and the E. ½ of the SW. ¼ of a specified section, and

"also 80 inches of water measured under six inch pressure of that certain water right out of what is known as the Sparta Ditch, in Baker County, Oregon, as such water right is defined and measured by the State Water Board of Control of the State of Oregon, in its findings and adjudication in the matter of the adjudication of the rights of various claimants to the waters of Powder River and its tributaries.

"Also a *pro rata* interest in 250 inches of water allowed to the Sparta Irrigation (Company) under its appropriation through said ditch in the discretion of the water master to cover seepage and loss of water in transit from the point of origin to the point of delivery."

In this deed Campbell covenants that he is the owner in fee simple of the premises and that they are free from all encumbrances, except a mortgage

executed by the Sparta Irrigation Company to the Grand Rapids Trust Company on October 3, 1914, and a supplemental mortgage ''between the same parties, of date October 3, 1916,'' which mortgages the grantee ''assumes and agrees to pay her *pro rata* share thereof, hereby fixed and agreed to be the sum of $2,400, with interest.''

It was understood that if Mary C. Harvey purchased, Wheeler would lease the land purchased by her, and that Campbell would also rent the remainder of his land to Wheeler; and, accordingly, Wheeler did lease the Mary C. Harvey land and also the remainder of the land owned by Campbell, and as such lessee Wheeler had control of all the land and of the water used thereon during the season of 1918. Wheeler continued as lessee of the Harvey land until the time of the trial, and hence his interest in the Mary C. Harvey premises is only that of a lessee. The Campbell lands were farmed by a son of Wheeler's in 1919; and during the irrigating season of that year plaintiff Wheeler managed the distribution of the water available for the Campbell and Mary C. Harvey lands. But in the fall of 1919, Campbell made it known that he would not lease his land to Wheeler for another year; and, accordingly, Campbell rented his farm to William Long for the year 1920. In 1918 and in 1919, when Wheeler had charge of the distribution of the water available for use on the 760 acres, he was able so to control the water that he could use all of it first on the Campbell lands and then on the Harvey lands so that there was no friction or clash of interests in the use of the water.

However, in the season of 1920 there was a clash of interests, because the Harvey land was farmed

by Wheeler and the Campbell land by Long. The Sparta ditch did not carry enough water fully to supply the wants of both the Campbell and the Harvey lands. Campbell and his agents caused the water to be divided so that each farm would receive its *pro rata* share of the quantity belonging to the 760 acres owned by Campbell, Mary C. Harvey and Mrs. Dunne. Claiming that by force of the terms in her deed she was entitled, as against Campbell, to receive eighty inches of water before any water could be applied on the Campbell land and that she was not obliged to prorate the water with Campbell, Mary C. Harvey, together with her tenant Wheeler, commenced this suit and prayed for a decree that Mary C. Harvey be adjudged to be the owner of the right to divert and use from the waters of the Sparta ditch eighty inches of water measured under a six-inch pressure at all times during the irrigating season of each year, and that defendants be restrained from interfering with the plaintiffs in their use of the full amount of eighty inches of water measured under a six-inch pressure.

A trial terminated in a decree dismissing the suit without costs. The plaintiffs appealed.

AFFIRMED.

For appellants there was a brief over the name of *Messrs. Packwood & Packwood,* with an oral argument by *Mr. W. H. Packwood.*

For respondents there was a brief over the name of *Messrs. Nichols & Hallock,* with and oral argument by *Mr. Blaine Hallock.*

HARRIS, J.—The controversy arises out of the language referring to the water right in the deed

from Campbell to Mary C. Harvey. The plaintiffs vigorously contend that the language found in the deed is plain and that it is manifest

"that the thing intended to be sold was eighty inches of water, to be measured under a six inch pressure, and to be taken out of the Sparta Ditch, and from the water right belonging to the grantor, Campbell."

More than eighty inches of water have been coming to the 760 acres which Campbell alone once owned and of which Mary C. Harvey now owns 160 acres. We are informed by one of the printed briefs that if the first eighty inches coming to the 760 acres are awarded to the Mary C. Harvey farm, no land except the land now owned by Campbell will be affected.

Campbell contends that the language employed in the deed is descriptive of the water right there conveyed and

"admits of no other construction than that she was to receive the right to the use of 80 inches of water measured under six inch pressure taken out of the west fork of Eagle Creek through the Sparta Ditch when that amount of water was available, as her proportionate share of the water flowing in said ditch, and that the reference made to the findings and order of determination of the State Water Board, and set forth as a part of the description of this water right, establishes beyond question the fact that the term '80 inches,' was merely descriptive of plaintiffs' proportionate right in and to the waters of that stream, which right was by said findings and order, made appurtenant to the lands of the stockholders of Sparta Irrigation Company."

1. In the construction of a deed, as in the construction of any other written instrument, the intention of the parties, is to be pursued, if possible: Section 716, Or. L. If the expressed meaning is plain on the face of the deed, such expressed meaning will

control: 18 C. J. 257. The position taken by the plaintiffs is that the plainly expressed meaning of the deed is that Campbell conveys to her eighty inches of water measured under a six-inch pressure. If the deed contained nothing more than this then the position assumed by the plaintiffs might be secure. But the deed contains more; it conveys eighty inches of water of that certain water right taken out of what is known as the Sparta ditch and then, instead of defining or measuring the water right, the deed proceeds by referring for definition and measurement to certain findings and an adjudication made by the water board.

2. The deed, if taken by its four corners and read by itself without any information concerning the circumstances under which it was made, or of the situation of the subject of the conveyance or of the parties, is indefinite and uncertain. The instrument appears to be awkwardly worded; and yet this seeming awkwardness may be easily accounted for. The deed does not pretend to give complete information concerning the water. The instrument standing alone does not purport to give full information concerning the water right. The language found in the instrument obviously contemplates that the deed must be and that it will be always read in connection with the specified findings and adjudication of the water board, because attention is expressly and designedly directed to such findings and adjudication for not only the definition but also for the measurement of the water right. It becomes necessary then to inspect the findings and adjudication of the water board; and in order that the court may be placed in the situation of the parties and in order that we may know the surrounding circumstances so that we can properly

construe the language under examination, it becomes necessary to relate the story as it is told by the record.

3, 4. The Sparta ditch dates back to 1870; for in that year a notice was posted appropriating a specified quantity of water and the construction of a ditch was begun, and in the following year, 1871, "water was run through said ditch to the town of Sparta." It appears that when the ditch was completed between 1,000 and 1,500 inches of water were diverted into the ditch, and about 800 miner's inches delivered to the water users. Apparently in the beginning water diverted through the Sparta ditch was used principally if not entirely for mining purposes, but latterly it has been used exclusively for irrigation.

The Sparta Irrigation Company was organized in 1913 with 500 shares of capital stock. The company was organized by the persons who owned the 1,500 acres of land and for the purpose of acquiring the Sparta ditch and water rights. Each of such owners subscribed for shares of stock in proportion to the land owned by him. F. W. Tallmadge, the then owner of the 760 acres subsequently acquired by Warnock, subscribed for 251 shares. In 1914 the Sparta Irrigation Company acquired the Sparta ditch and water rights; and in the same year the several owners of the 1,500 acres transferred their respective portions of such 1,500 acres to the Sparta Irrigation Company. This corporation then borrowed $22,500 from the Grand Rapids Trust Company on its bonds secured by a mortgage on property, including the 1,500 acres, the title to which stood in its name. The object of transferring the 1,500 acres to the Sparta Irrigation Company was to enable the com-

pany to borrow money; and so when that object was accomplished, the lands were promptly reconveyed to the real owners, burdened of course with the mortgage.

On September 23, 1916, the stockholders of the Sparta Irrigation Company prepared, adopted and caused to be issued to each stockholder a certificate headed: "Certificate of Water Right issued by the Sparta Irrigation Company." It is said that this form of certificate was designed for the purpose of providing for the equitable distribution of the waters to be diverted through the Sparta ditch. It should be explained also that the certificate is not to be confused with the ordinary stock certificate issued by all corporations. The certificate of water right issued to F. W. and L. W. Tallmadge (predecessors in interest of Campbell) illustrates the purpose of this form of certificate issued by the corporation to its stockholders. The document certifies that F. W. and L. W. Tallmadge own 251 shares of the capital stock of the Sparta Irrigation Company and also own 251/500 of the waters of the Sparta ditch for the purpose of irrigating 753 acres of land which is definitely described by legal subdivisions, including the land purchased by Mary C. Harvey. The document also recites the following:

"In case the ownership of said lands is changed by conveyances thereof in amounts less than the whole, then the rights under this certificate shall attach to each owner of such lands in the proportion as his interest therein may bear to the whole of said lands, and this certificate may be cancelled and new certificates issued, in like tenor, covering the right to each owner in the proportion to which he be entitled.

"All expenses in the upkeep, extending or enlarging of said ditch, or in the supervision of the

distribution of the waters thereof, together with all necessary expenses in the running of said company, shall attach to said land, and to the right to use water out of the said Sparta ditch as evidenced by this certificate and be a lien thereon until paid in the same proportion as the number of acres of land above described bears to the whole number of acres irrigated out of said ditch. * *

"The Grand Rapids Trust Company, of Grand Rapids, Michigan, now has a trust deed or mortgage upon the said ditch and other lands in the sum of $22,500.00, due Jan. 1, 1925, with interest at 6% per annum, payable January 1st of each year, and the above described lands for which this water right is issued shall bear their share in discharging and satisfying said mortgage, according to its terms, which proportion for said lands above described amounts to the sum of $11,295.00 with interest, and in case of foreclosure, costs and attorney's fees."

The Tallmadge certificate was recorded October 20, 1916.

In 1909, a petition was filed with the Board of Control (now known as the State Water Board) asking for a determination of the relative rights of all persons to the use of the waters of Powder River and its tributaries. The board acted upon the petition and subsequently on April 1, 1916, the board, in the language of the findings made by the trial court,

"filed in the office of the County Clerk of Baker County, Oregon, its Findings of Facts and Order of Determination in the matter of the determination of the relative rights of the waters of Powder River, and that final decree in said matter was thereafter, on the 18th day of March, 1918, entered in this court, and that said findings are the findings and adjudication referred to in said deed in its description of the conveyed water right therein mentioned."

In the Powder River adjudication it was determined that the stockholders of the Sparta Irrigation Company owned 1,500 acres of land susceptible of irrigation through the Sparta ditch, and that 750 inches or one-half inch per acre would be sufficient to irrigate the area; but in order to provide against seepage and to insure the delivery of 750 inches of water upon the land, it was further provided that 250 inches should be allowed for seepage and loss, and that therefore the Sparta Irrigation Company was entitled to divert 1,000 inches of water from the public stream and into its ditch. It appeared at the time of the adjudication that only a portion of the 1,500 acres was ready for irrigation, and therefore time was granted to prepare for changing the use of water "from sale for domestic, mining, power and irrigation use, to an irrigation use"; and "the lands to be irrigated in making such change shall be tabulated herein under the head of inchoate rights."

In this tabulation appear four subdivisions of forty acres each covering the lands now owned by Mary C. Harvey. It will be recalled that in the certificate of water right issued by the Sparta Irrigation Company to F. W. and L. W. Tallmadge it is recited that they own 251/500 of the waters of Sparta ditch and are entitled to 251/500 of such water for the purpose of irrigating 753 acres of land in certain described premises. (The premises are described by legal subdivisions which, in the absence of shortage, embrace 760 acres.) In the decree of the Circuit Court rendered in the Powder River adjudication it is determined that F. W. and L. W. Tallmadge, his wife, "of said stockholders (of the Sparta Irrigation Company) are to have the use and enjoyment of 376½ inches thereof, the same to be

appurtenant to the following described lands.'' Then follows a description of the lands by legal sub-divisions which, in the absence of a shortage, embrace 760 acres. It will be observed that the allowance of 376½ inches is at the rate of one-half inch per acre for 753 acres.

Wheeler worked for Campbell for wages for only a few weeks. When Mary C. Harvey purchased her land she at once leased it to Wheeler, and at the same time Wheeler rented from Campbell the remaining land owned by him. Campbell also sold some land to Mrs. Dunne; and Wheeler also had control of that land. During the season of 1918 Wheeler had control of the distribution of all the water available for use on the lands then owned by Campbell, Mrs. Dunne and Mary C. Harvey; and he was in a position therefore to rotate the use of the water. A son of Wheeler leased the Campbell land in 1919, but during that season, just as during the season of 1918, Wheeler controlled the distribution of the water; so that there was no friction or clashing of interests during the irrigating seasons of 1918 and 1919, although it does appear in the record that Wheeler claimed that Campbell made some objection to the manner in which Wheeler was using the water. However, in 1920, the situation changed; for Campbell leased his land to William Long. The plaintiffs commenced this suit on August 27, 1920.

In 1917 when Campbell purchased from Warnock only a comparatively small portion of the 753 acres owned by Campbell had been prepared for water; but after delivery of the deed to Campbell more land was each year prepared and made ready for irrigation, so that in 1920 a much larger area was in a condition to be irrigated than in 1917. In the Powder

River adjudication notice was taken of the fact that the capacity of the ditch had been reduced and that it would be necessary to enlarge the ditch before it could carry one half an inch per acre for the 1,500 acres entitled to water; and consequently a period of five years was allowed as time within which to enlarge the ditch and restore it to its original capacity. In 1917 when Mary C. Harvey purchased from Campbell, the ditch had not yet been enlarged. The capacity of the ditch in 1917 was only about 375 inches. In other words, the ditch could supply only 375 inches for the 1,500 acres. These 375 inches were prorated among the owners of the 1,500 acres. The proportion which was available for use on the 753 acres owned by Campbell, Mrs. Dunne and Mary C. Harvey at all times in 1918, 1919 and 1920 exceeded eighty inches, but at no time did it equal one-half inch per acre. Apparently Wheeler was able to distribute the water with satisfactory results in 1918 and 1919; but in 1920 because of the increase of land prepared for irrigation and because of the change in conditions there was not enough water to satisfy the wants of the Harvey land if the water available for use on the Campbell and Harvey lands was prorated. If on the other hand the first eighty inches had been diverted to the Mary C. Harvey land only a small and insufficient quantity would have remained for use on the Campbell land.

When Campbell purchased from Warnock he also received with the deed a transfer of the 251 shares of stock in the Sparta Irrigation Company which the Tallmadges had owned; and when Campbell conveyed 160 acres to Mary C. Harvey he also transferred to her 53⅓ shares of such stock as her proportionate

interest in the ditch and water right. Mary C. Harvey knew before she purchased the land that she would receive this stock together with a deed for the land. She attended the regular annual meeting of the stockholders of the company held on February 4, 1918, and was elected a director; and at the meeting of the directors, held on the same day, she was elected secretary-treasurer, and as such officer kept the minutes of the meeting. She also attended the annual meeting of the stockholders held on February 4, 1919; and the minutes of that meeting were written by Mary C. Harvey as secretary-treasurer.

There was evidence to the effect that an irrigation district had been organized; and that it was expected by the stockholders of the company that the district wished if possible to acquire the right to use the company's ditch. It is claimed by the defendants that this subject was discussed at the February 4, 1919, meeting of the stockholders of the company and that the stockholders were advised that they ought without delay to enlarge the ditch because the time allowed by the water board for enlargement was about to expire. There was evidence to the effect that it was suggested at the meeting that possibly arrangements could be made whereby the district in consideration for the right to use the ditch would agree to pay all the expense of enlargement and would enlarge the ditch sufficiently to carry water for both the district and the stockholders of the company and thus save the stockholders from paying for any of the work, but that if any right to the ditch should be transferred to the district care ought to be used so as to preserve for the company the right to 750 inches of water without regard to the past or present carrying capacity of the ditch. This evidence

offered in behalf of the defendants is to some extent corroborated by the minutes of the stockholders' meeting held on February 4, 1919.

On September 15, 1919, an attempt was made to hold a special stockholders' meeting at the Campbell ranch with a view of taking necessary steps for enlarging the ditch. Mary C. Harvey and Mrs. Dunne refused to sign waivers of notice, and the former made it known that in her deed she claimed the right to eighty inches of water without any liability to pay any expense incurred in enlarging the ditch, although she did state that she was liable for her proportionate share of the expense of upkeep.

There is an irreconcilable conflict in the testimony. Mary C. Harvey says that she purchased solely on the faith of representations made by Campbell; but he claims that Wheeler induced her to buy. It is conceded that Wheeler received from Campbell a commission on the basis of $5 per acre for the land sold to Mary C. Harvey as well as for the land sold to Mrs. Dunne; and it is likewise admitted by Mary C. Harvey and Mrs. Dunne that they did not know prior to the purchase that Wheeler was to receive any commission; nor did they know until long after they purchased that he had received a commission. It is claimed by the plaintiffs that prior to the sale to Mary C. Harvey, Campbell represented that there was plenty of water in the ditch so that the land would receive one-half inch per acre, and that they were given to understand that the ditch was carrying 750 inches of water; that Campbell said nothing to Mary C. Harvey about the necessity of enlarging the ditch until September 15, 1919, when an attempt was made to hold a special meeting of the stockholders; and that nothing was said prior to the

sale about prorating the water.   Campbell claims that
Wheeler on the day of his arrival looked at the
ditch and estimated that it was carrying only about
500 inches; that Mary C. Harvey knew that it would
be necessary to enlarge the ditch before it could carry
750 inches, and that if she purchased she would receive
with the deed 53⅓ shares of stock of the Sparta Irri-
gation Company entitling her to 53⅓ five hundredths
of the water coming from the ditch; that she examined
an abstract containing a transcript of the certificates
of water right issued to the Tallmadges, and that she
knew of all the provisions in the certificate; that she
was aware of all the facts relating to the water
right, including the fact that by purchasing the land
she would acquire the right only to her proportionate
share of 750 inches of water or her proportionate
share of whatever less quantity was delivered by the
ditch.

An attempt to reconcile the testimony would be to
attempt a hopeless task.   Obviously the trial judge
who saw and heard the witnesses was on that account
in a better position to determine the facts than we
can possibly be when examining a mere paper record.
It is our conclusion, after a careful investigation of
the entire record, that we are not warranted in dis-
turbing the findings made by the trial judge who
found among other facts the following:

"That at the time of delivery of the aforemen-
tioned deed said Sparta ditch was not in such con-
dition as to carry the full quantity of 750 inches, and
that said parties knew thereof and knew the status
of the title to said ditch and water right, and the
method of distribution of said waters among said
stockholders as heretofore stated.   That simultane-
ously with the delivery of said deed the said defend-
ant Floyd J. Campbell assigned from his holdings of

said capital stock, and caused to be issued to said plaintiff Mary C. Harvey, in lieu thereof 53 and 1/3 shares of said capital stock, same being the number of shares to which she as such owner of 160 acres of said land would be entitled under the system under which the waters flowing in said ditch were to be distributed by said corporation.

"That said parties to the aforesaid deed knew of said certificate and of the rules and regulations under which said Sparta Irrigation Company was obligated to distribute the waters flowing in said Sparta ditch; and that said plaintiff accepted and retained the said shares of capital stock so delivered and assigned to her, and became one of the directors of said corporation, and served as its secretary and participated in its meetings and availed herself of the benefits accruing to her by virtue of being such stockholder, and that ever since said plaintiff became such stockholder she has, like the other stockholders, received and accepted from said corporation the same proportion of the total flow of water in said Sparta ditch as the number of shares of capital stock held by her bears to the total issue, all in conformity with said rules and regulations and as in said certificate provided; and that said corporation distributed said water continually to each of said stockholders, including the said plaintiff Mary C. Harvey, and said defendant Floyd J. Campbell, *pro rata* according to the number of shares held by each stockholder respectively, and under which system the said plaintiff received 53 and 1/3 five hundredths as owner of 53 and 1/3 shares of said capital stock, and said defendant received 197 and 2/3 five hundredths as owner of 197 and 2/3 shares of said capital stock.

"That by reason of said Sparta ditch not being in its present condition capable of carrying the full quantity of 750 inches of water, which quantity said corporation had the decreed right to divert, there was never available from said ditch the full quantity of one-half inch per acre to the lands of

said stockholders, and that for said reason, and not otherwise, neither said plaintiff nor said defendant, nor any other stockholder, received at any time the full quantity of one-half inch per acre of said water; and that said quantity cannot be had until said Sparta ditch shall have been so improved and repaired; and that with a view to carry out the said purposes of the organization under its articles and by-laws the said corporation has undertaken to provide the plans and means to carry into effect the said necessary improvements.

"That prior to the execution of said deed the said plaintiff S. S. Wheeler occupied said lands of said Floyd J. Campbell as lessee, and since the execution of said deed occupied also the said lands so conveyed to said Mary C. Harvey as lessee; that said plaintiff S. S. Wheeler was thoroughly experienced and familiar with the quantity of water flowing and available through said Sparta ditch and with the use thereof for irrigation of said lands, and knew of the said status of the title and said rules and regulations under which said waters were distributed; and that in the negotiations between the said parties to said deed the said S. S. Wheeler acted as agent between them, and received compensation by way of commission for his services as such agent; and that after the execution, the same as theretofore, the said lessees continued to receive and accept, under said system and regulations so adopted, for the use upon said lands so conveyed as well as upon the lands still owned by said grantor, the water as so distributed by said corporation in accordance with the said respective shareholdings, and not otherwise, so long as he remained such lessee of said grantor."

We also approve the following conclusions reached by the trial court:

"Since no reference to any capital stock in said corporation is mentioned in said deed, and since nevertheless said grantor assigned and delivered to said grantee 53 and 1/3 shares of said capital stock out of the shares theretofore held by said

grantor, and since said grantee accepted and retained said shares and availed herself of the benefits thereof in conformity with the by-laws and rules and regulations under which said corporation managed said affairs and distributed said water, under which system and regulations, and as known to both of said parties, the waters were so distributed to such stockholders *pro rata* according to the number of shares held by each respectively, said facts and said voluntary acts evidenced the meaning with which each read and understood said deed and their said transactions, and that said deed cannot be construed to mean that the full or maximum quantity of one-half quantity flowing in said ditch or quantity available and regardless of the number of shares of said capital stock held by such stockholders.

"Since the findings of said State Water Board disclose that the water right of said Sparta Irrigation Company was an inchoate right, and since said corporation was by said adjudication and findings allowed time to perfect its appropriation and to then divert as a maximum quantity, not to exceed 750 inches, and 250 inches allowed for seepage and loss; and since it is established by the evidence herein that said maximum quantity had not been diverted and could not be carried in said ditch until said system was completed and said ditch repaired and improved, which facts were well known to the parties to said deed, the description of said granted water right mentioned in said deed means a water right of like or similar character, i. e., a right to divert from said ditch a maximum quantity of 80 inches when said system shall have been perfected and said ditch so improved and repaired; and that same does not mean that said quantity is to be furnished by said grantor from his private ditches."

The decree is affirmed but without costs to any party in either court.        AFFIRMED.

Mr. Justice RAND took no part in the consideration of this case.

Reversed on rehearing April 10, 1923.

ON REHEARING.

(214 Pac. 348.)

REVERSED.   REHEARING AND MOTION TO RETAX
COSTS DENIED.

For appellants there was a brief over the name of
*Messrs. Packwood & Packwood,* with oral arguments
by *Mr. Irving Rand* and *Mr. Wm. H. Packwood.*

. For respondents there was a brief over the name
of *Messrs. Nichols & Hallock,* with an oral argument
by *Mr. James H. Nichols.*

BURNETT, J.—This suit was heard and de-
termined by this court and a decree rendered June
27, 1922, affirming the decision of the Circuit Court
dismissing the suit. Afterwards a rehearing was
granted and the cause comes on now to be determined
anew.

It substantially appears by the complaint that the
defendant Sparta Irrigation Company is a corpora-
tion of this state organized for the purpose of hold-
ing and operating what is known as the Sparta ditch,
conveying water from West Eagle Creek to the lands
of the plaintiffs and other lands belonging to the
stockholders of that company; and that the rights to
the water carried in the ditch were held severally by
the plaintiff Mary C. Harvey and other shareholders
in that concern.   On and prior to October 8, 1917, the
defendant Campbell was the owner of 160 acres of
land in section 25, township 8, south of range 43 east,
Willamette Meridian, and other lands totaling 760
acres, and at that time was also a stockholder in the
corporation and the owner of a right to take and

divert a quantity of water far in excess of 80 inches measured under six-inch pressure, and at all times since has been and now is the owner of the 760-acre tract, with the exception of the 160 acres first mentioned, and of the right to take water from the ditch, from which he has in fact taken and diverted water much greater in quantity than the eighty inches mentioned.

It is further alleged in the complaint and admitted by the answer that on October 8, 1917, the defendant Campbell and his wife made, executed and delivered to the plaintiff Mary C. Harvey a warranty deed, which, omitting from the covenants allusions to certain mortgages about which there is no dispute, reads as follows:

"This Indenture, Witnesseth; that we, Floyd J. Campbell, and Minnie D. Campbell, his wife, of Portland, Oregon, for the consideration of the sum of five and no/100 dollars, to us in hand paid, the receipt whereof is hereby acknowledged, have bargained and sold, and by these presents do bargain, sell and convey unto Mary C. Harvey, all the following described premises, to wit:

"The west half (W. ½) of the southeast quarter (SE. ¼) and the east half (E. ½) of the southwest quarter (SW. ¼) of section 25, in township 8 south, range 43 E., W. M., in Baker County, Oregon, containing 160 acres of land; and also 80 inches of water measured under six-inch pressure of that certain water right taken out of what is known as the Sparta ditch in Baker County, Oregon, as such water right is defined and measured by the state water board of control of the State of Oregon, in its findings and adjudication in the matter of the adjudication of the rights of various claimants to the waters of Powder River and its tributaries; also a *pro rata* interest in 250 inches of water allowed to the Sparta Irrigation Company under its appropriation through said ditch in the discretion of the water-

master to cover seepage and loss of water in transit from the point of origin, to the point of delivery.

"To have and to hold the said premises with their appurtenances, unto the said Mary C. Harvey, her heirs and assigns, forever, and we, the said Floyd J. Campbell and Minnie D. Campbell, his wife, grantors herein, do hereby covenant to and with the said Mary C. Harvey that we are the owners in fee simple of said premises; that said premises are free and clear of all encumbrances save and except * * ; and subject to all the above encumbrances, the said grantors herein will warrant and defend the title to the property herein conveyed from all lawful claims whatsoever.

"In witness whereof, we have hereunto set our hands and seals this 8th day of October, 1917.

"FLOYD J. CAMPBELL.    (Seal)

"MINNIE D. CAMPBELL,    (Seal)

"Signed in the presence of:

"MARY E. DAY.

"O. S. HUBBELL."

Further, the primary pleading avers in substance that the lands included in that conveyance are dry and arid and require artificial irrigation to make the same productive; that the eighty inches of water measured under six-inch pressure conveyed by the deed, was and is appurtenant to the land and so adjudicated by the findings of fact and order of determination of the State Water Board of the State of Oregon filed in the office of the county clerk of Baker County, Oregon, April 1, 1916, and by the decree of the Circuit Court of Baker County, Oregon, rendered March 18, 1918; which findings, order of determination and decree were made in the matter of the adjudication of the rights of various claimants to the use of the waters of Powder River, and its tributaries; of which said Powder River, West Eagle Creek was and is an affluent.

The plaintiff Harvey alleges herself to be a stockholder in the Sparta Irrigation Company, defendant, ever since October 8, 1917, holding 53⅓ shares of the capital stock thereof; that the plaintiff Wheeler is her lessee of the 160-acre tract mentioned, owning one half of the crops raised thereon. Since the conveyance to Mrs. Harvey, the plaintiffs have improved the lands, prepared them for irrigation, constructed ditches, and have the tract in cultivation in certain crops named; that at all times during the irrigation season of the year 1920 there has been flowing in the Sparta ditch at the point where the water has been diverted for the use of the plaintiffs upon the lands of the plaintiff Harvey and for the use of the defendant Campbell a quantity of water much greater than eighty inches, which was turned out by the irrigation company from the ditch for the use of plaintiffs upon their lands and for the use of Campbell upon his lands, a quantity at all times more than sufficient to afford the plaintiffs the full and uninterrupted use of eighty inches thereof, which amount is requisite and necessary for the proper irrigation of their land. It is charged in the complaint that notwithstanding the terms and provisions of the deed, and without right or authority so to do, in violation of plaintiffs' rights, the defendant Campbell during the irrigation season of 1920 has diverted from the waters turned out from the Sparta ditch for the use of plaintiffs all except about 35 inches thereof and has deprived the plaintiffs of the use of more water than that, which has been permitted and allowed by the defendant corporation, of which Campbell is president and in charge; and that they threaten and intend to do so in the future, unless restrained by the court. The complaint charges in substance that on account

of the acts of the defendants the plaintiffs have been deprived of the use of the water and have been unable to irrigate their premises properly; and that the crops growing thereon were to a large extent dried out and destroyed, all on account of the wrongful acts of the defendants.

The prayer is, in substance, that the plaintiff Mary C. Harvey be decreed to be the owner of the right to divert and use from the waters of the said Sparta ditch where the same enters upon her premises, said eighty inches of water; and that the defendants be restrained from disturbing or in any way interfering with her use of the full amount of eighty inches of water.

A demurrer *to the complaint* by both defendants was overruled. In practically identical answers the defendants admit the corporate character of the defendant company, the ownership by Campbell of 760 acres, and the right to divert from the Sparta ditch a quantity of water in excess of eighty inches; that Campbell and his wife made, executed and delivered to the plaintiff Mary C. Harvey the deed mentioned; and that the lands are dry and arid, requiring artificial irrigation to make them productive. The answers admit the plaintiff Harvey's ownership of 53⅓ shares of the capital stock of said corporation, the tenancy of Wheeler, the cultivation and improvement of the premises and their preparation for irrigation, and that more than eighty inches of water have been turned out of the Sparta ditch for the use and benefit of the plaintiff Harvey upon her lands and for the use of the defendant Campbell upon his lands.

Affirmatively defending, the answers show that the corporation shortly after its organization in 1913,

acquired by purchase what are known as the Sparta and Hogum ditches in Baker County, Oregon, and the water rights in connection therewith, and certain real property not involved in this suit; that the right to divert water through those ditches was initiated about the year 1870; that the capital stock of the company is divided into 500 shares of the par value of $45 each, amounting to $22,500, all of which stock has been subscribed, and of which the plaintiff Mrs. Harvey at present owns 53⅓ shares and the defendant Campbell owns 197⅔ shares; that the stockholders of the corporation are the owners in the aggregate of 1,500 acres of land susceptible of irrigation by means of the Sparta ditch, of which land the plaintiff Mrs. Harvey is now, and ever since October 8, 1917, has been, the owner of 160 acres as described in her complaint. All of the 1,500 acres mentioned are in their natural state arid and require artificial irrigation.

The answers go on to set up certain proceedings begun May 27, 1909, before the State Water Board, seeking an adjudication of the right of claimants to the waters of Powder River and its tributaries including the west fork of Eagle Creek, which finally resulted as embodied in a final decree of the Circuit Court of Baker County in an allowance to the 1,500-acre tract of land of 750 inches of water to be delivered on the land, besides an additional allowance of 250 inches to compensate for seepage and evaporation.

The answers further aver that on September 23, 1916, the individuals then stockholders of the Sparta Irrigation Company adopted a certain instrument denominated a water right certificate, the blank form of which certificate is as follows:

"This is to certify that ——, by virtue of his owner-ship of —— shares of the (500) shares, Five Hundred shares of the capital stock of the Sparta Irrigation Company is also the owner of ——/500 of the waters of the Sparta ditch owned by said company and is entitled to the exclusive use and benefit of such ——/500 of such waters of said ditch for the purpose of irrigating —— acres of land in Tp. —— South of Range —— E., W. M., in Baker County, Oregon, as adjudicated in such lands by decree of the Circuit Court for Baker County, Oregon, and by the State Water Board subject however to the following pro-visions and conditions:

"I.

"Such lands may be sold or assigned and conveyed and in such case all rights and conditions of this certificate shall pass by *any conveyance thereof as an appurtenant to said lands, unless the owner of this certificate shall expressly reserve this certificate from such conveyance,* but in no case shall the right to use any water on or in connection with any other lands, other than those above described be permitted or allowed except by the express consent of this com-pany.

"II.

"In case the ownership of said lands is changed by conveyance thereof in amounts less than the whole the rights under this certificate shall attach to each owner of such lands in the proportion as his interest therein may bear to the whole of said lands, and this certificate may be cancelled and new certificates issued in like tenor conveying the right to each owner in the proportion to which he be entitled.

"III.

"All expenses in the upkeep, extending or enlarg-ing of said ditch or in the supervision of the dis-tribution of the waters thereof together with all necessary expenses in the running of said company shall attach to said lands and in the right to use water out of the said Sparta ditch as evidenced by this certificate and be a lien thereon until paid in the

same proportion as the number of acres of land above described bears to the whole of acres irrigated out of said ditch, and said lien may be foreclosed in the same manner as liens secured by mortgages on real property are now foreclosed, and in case of such foreclosure a lien for costs and reasonable attorneys' fees shall also be allowed thereon. This remedy is in addition to any other remedy this company may provide in raising funds for the purpose aforesaid or for any other legitimate purpose.

"IV.

"The Grand Rapids Trust Company of Grand Rapids, Michigan, now has a trust deed or mortgage upon the said ditch or other lands in the sum of $22,500.00 due January 1st, 1925, with interest at six per cent per annum payable January 1st of each year, and the above described lands for which this water right is issued shall bear their share in discharging and satisfying said mortgage according to its terms, which proportion for said lands above described amounts to the sum of ($——) with interest, and in case of foreclosure costs and attorney fees.

"V.

"This certificate is granted subject to the laws of the state of Oregon and the rules and regulations now in force or which may hereafter be adopted for the government of this company.

"VI.

"This certificate shall be of no force or effect unless signed by the President and Secretary of the company and also accepted by the person to whom this certificate is issued by the signature of such person.

"In Witness Whereof the President and Secretary of the said Sparta Irrigation Company have hereunto subscribed their names and affixed the seal of said company at Baker, Oregon, this —— day of ——, 1916.

"SPARTA IRRIGATION COMPANY.

"By ———————————— President.

"By ———————————— Secretary.

"I, to whom the above certificate was issued do hereby accept the same subject to the conditions thereof.

"_____."

The defendants then narrate that on September 23, 1916, a water right certificate in this form was issued by the defendant company to F. W. Tallmadge and L. W. Tallmadge, who were the predecessors in interest of the plaintiff Mary C. Harvey in the lands owned by her, and other lands then owned by them, which certificate was accepted by the Tallmadges and thereafter recorded in the deed records of Baker County. Afterwards Campbell purchased out of the 1,500-acre tract of land 760 acres, being the identical tract owned by the Tallmadges and embracing the parcel of 160 acres which Campbell sold to Mrs. Harvey, and soon afterwards employed the plaintiff Wheeler to manage the tract of 760 acres mentioned, and still later agreed to pay Wheeler a commission of $5 per acre, if the latter would secure a purchaser for any portion of the lands at $90 per acre. The answers aver that Wheeler induced the plaintiff Mrs. Harvey to inspect the premises, which she did, and thoroughly informed herself respecting them, the water supply available through said ditch for the irrigation thereof, the ditches and laterals through which it was supplied to the land, and generally about all of the hereditaments and appurtenances, particularly the water situation pertaining to the premises and the matter of the distribution of the water between the stockholders of the Sparta Irrigation Company. It is likewise averred that prior to the purchase of the lands, Mrs. Harvey was furnished with an abstract of title to the premises completed to the date of her purchase, setting forth a complete

statement of the manner of the determination of the water right embodied in the decree of the Circuit Court, which abstract contained the water right certificate issued to her predecessors; and that at and prior to the purchase by her of the lands, the plaintiff Mrs. Harvey inspected the corporate records of the defendant company and was fully informed of the fact that in purchasing the land she would receive a proportionate interest in the stock of said Sparta Irrigation Company, defendant herein, and was fully informed of the obligation which she would assume as such stockholder, the responsibility to be assumed by her as such stockholder and the benefits she would receive therefrom.

It is charged in substance in the answers that the plaintiff Mrs. Harvey, by virtue of the decree of the court and the certificate of water right, is entitled to and has received only a proportional interest in the total amount of water diverted by the Sparta ditch.

The twelfth allegation of the answer of the defendant Campbell is as follows:

"That at the time of the purchase of said lands by said plaintiff Harvey it was thoroughly understood and agreed by and between said plaintiff and this defendant that defendant sold and conveyed to plaintiff and that plaintiff purchased from defendant, in connection with and as appurtenant to said lands 53⅓ five hundredths of the water available for distribution through said Sparta Ditch and the stock certificate evidencing such interest and that no covenant or agreement was ever intended to be made by said defendant or received or purchased by plaintiff covering a definite amount of water other than as above stated. That said parties having so agreed intrusted the preparation of the necessary instrument of conveyance to a scrivener as a result of which the deed mentioned and described in plaintiff's

complaint was prepared and executed.   That defendant is without negligence in said matter and that if said instrument so prepared and executed does not in fact express the said understanding and agreement had between said parties, then such failure to express said agreement is the result of a mutual mistake, between said parties and that said instrument should be reformed to express said agreement and understanding.''

That pleading concludes with the averment to the effect that shortly after she purchased the premises the plaintiff Harvey became a director of the defendant corporation and during the year 1918 was secretary thereof, had charge of its corporate records, was fully informed as to all of the matters and things set forth in the answer, and participated in the management, control and operation of the ditch and in the distribution of the waters diverted thereby.

For further and separate answer, Campbell reiterates all of the new matter hitherto set forth and avers that the plaintiff Harvey should be estopped from setting up her claim against the defendant Campbell as narrated in her complaint.

A demurrer to the separate answer of Campbell was overruled and a reply was filed, traversing the answer in all respects except as alleged by the plaintiffs.   The reply further sets up the history of the transaction resulting in the deed together with its covenants, and claims that Campbell is estopped by his deed from asserting that he sold only a proportional part of the water, and from asserting that the plaintiff Harvey is not the owner of the full amount of eighty inches thereof.

The Circuit Court after hearing the testimony adduced by the parties made findings of fact and con-

clusions of law favorable to the defendants and dismissed the suit without allowing costs or disbursements to either party. The plaintiffs appealed.

5, 6. As a preliminary matter, it is proper to dispose of the intimated contention in the answer of Campbell respecting a possible mistake in the terms of the deed. The testimony in the shape of a copy of the conveyance to the defendant Campbell of the 760 acres from his immediate predecessor in title, is that its language except as to the acreage and the quantity of water conveyed, is identical with that employed by him in his conveyance to Mrs. Harvey. Respecting the form of his deed to the plaintiff Harvey, the defendant Campbell testified on crossexamination as follows:

"Q. Now, this deed, then, was drawn exactly as you wanted it drawn?

"A. It was drawn just a copy of the others as I instructed Mr. Nichols.

"Q. Just exactly as you wanted it drawn?

"A. Just as I instructed it drawn.

"Q. Because you wanted it drawn that way?

"A. Because I wanted it just a copy of the preceding deeds. That was the idea in mind.

"Q. And it wasn't drawn any different from what you intended it to be drawn, was it?

"A. I don't think so, because of the reasons I have told you."

It is not charged in the answer of the defendant Campbell that the mistake was mutual, or that Mrs. Harvey was guilty of any fraud which brought about the frame of the deed as expressed in that document. The allegation respecting the mistake is hypothetical and not positive. Neither the pleading nor the testimony is sufficient to raise the question of mistake.

The document, therefore, must be construed according to its legal effect, to be drawn from a proper construction of its terms.

The dispute here is about the division between Mrs. Harvey and Campbell of the water allotted to the 760 acres of land which Campbell purchased from Warnock, his immediate predecessor, and of which he sold 160 acres to Mrs. Harvey. The other stockholders of the defendant company are not concerned in the dispute between the parties to this case, as to the division of the water which Campbell held in severalty.

Having these features in mind, it is proper to review the testimony showing the situation of the parties and the subject matter of the deed. Campbell purchased the land from Warnock in the latter part of July, 1917, and took possession of the 760 acres on the first day of August of that year. He engaged the plaintiff Wheeler, who was experienced in irrigation, to take charge of the whole 760 acres and superintend the management thereof, at the same time employing the wife of Wheeler to cook for the hired men on the ranch. The Wheelers arrived there on August 13, 1917, and immediately took up the duties of their employment. Mrs. Harvey and Mrs. Wheeler are sisters. The former at that time was residing at Pendleton with another sister, Mrs. Dunne. After the Wheelers had been on the place about a month, with the permission of Campbell, Mrs. Wheeler invited her sisters to visit her. Meanwhile Campbell had employed Wheeler to find a purchaser for any portion of the land, promising him $5 per acre as compensation. Thus far there is no dispute about the facts.

Mrs. Harvey as a witness in her own behalf tes-
tifies in substance that soon after their arrival at the
Campbell ranch for the purpose of visiting with the
Wheelers, Campbell began to talk to them about pur-
chasing part of the land. The 160-acre tract after-
wards conveyed to Mrs. Harvey was partly in cultiva-
tion, set to alfalfa with a nurse crop of grain. There
was another 160-acre tract adjoining, which was yet
in virgin sagebrush. The alfalfa tract was under
irrigation, but there was no water on the sagebrush
tract. Mrs. Harvey testifies that Campbell took the
Wheelers, Mrs. Dunne and herself to the dam on the
race where the water was diverted to the Campbell
ranch and showed them the ditch leading to the Boyd
place, one to Campbell's home place where his house
was situated and another ditch to the 160-acre tract
which she afterwards purchased. Later he took all
of them, including Wheeler, about six miles from his
residence up to a point where the ditch ran under a
bridge in the road at the top of the hill near Sparta.
On viewing the ditch at that place she remarked that
she didn't think it looked like there was enough water
to irrigate the 1,500 acres he had been telling about,
and he declared that there was plenty of water, and
that as the irrigation season was nearly over part of
the water had been turned off above the bridge. Mrs.
Harvey says when questioned particularly about the
water and the ditch, that:

"He (Campbell) said that the ditch was one of
the oldest in the state, that there was the best water
right in the ditch of any in the state; that the court
had decreed 750 inches of water to the 1600 acres of
land; and that would be a half inch per acre for all
of the irrigable land; that this water was to be de-
livered on the land; that there was plenty of water;

he said there would be no difficulty about the water or the water-right, that it was sufficient for the land and it would be delivered on the land.''

Speaking of the transaction when the deed was drawn, she narrates that Campbell and herself, accompanied by the Wheelers and Mrs. Dunne, went to Baker to the office of Nichols & Hallock, attorneys, who appear for the defendants in the suit, and applied to Nichols to draw the deed. She says both Campbell and Nichols concurred in the explanation that eighty inches meant just the same as the half inch per acre, and that meant every year for the irrigation season. She says she did not receive the deed at that time, because it had to be sent to Portland for Mrs. Campbell's signature. The deed was dated October 8, 1917, and she received it in December of that year, after it had been recorded. She testified that Wheeler heard what Campbell said when they visited the place where the road crosses the ditch near Sparta, and that Wheeler remarked, ''If there is plenty of water as Mr. Campbell says, and I have no reason to doubt his word, I can raise a good crop on this land.'' The Wheelers, both husband and wife, and Mrs. Dunne and Mrs. Harvey all say that this was the first time any of them had been as far up the ditch as the road crossing near Sparta.

Mrs. Harvey declares that she never saw an abstract or had one in her possession prior to the making of the purchase; that the water certificate set out in the answers was not mentioned; and that she knew nothing about such a certificate. She imputes to Campbell the statement that the only other cost besides the $90 per acre which she paid for the land would be to pay for the upkeep of the ditch, which would include

the work necessary to keep it open, in slumming it and cleaning it out occasionally, and he estimated the cost as $85 per year for the 160 acres. Campbell denies that he made any estimate about the cost of maintaining the ditch. Speaking of the shares of stock, she testifies that she understood she was to receive 53⅓ shares of stock but that was for the upkeep of the ditch, just so she would have a voice in the upkeep of the ditch. Mrs. Dunne as a witness for the plaintiffs, tells substantially the same story as Mrs. Harvey concerning the view of the ditches from the diversion dam and about the quantity of water and the maintenance expense. Speaking of Campbell, she testifies:

"He said there was plenty of water, there was no question but what there was plenty of water, and I asked him, 'Now, Mr. Campbell, are you sure there is plenty of water for this land?' 'Mrs. Dunne,' he says, 'There is worlds of water.' That is the expression he used. * * He said there was plenty of water, but part of the water had been turned out above because the irrigating season was so near over."

Referring to the transaction of drawing the deed in the law office, Mrs. Wheeler testified substantially thus:

"They spoke of it being a good ditch and that there would be plenty of water, sure to be plenty of water * * and he says, 'I will give you a good deed, * * assure you of a half inch of water to the acre on the land.' And when they had made out the deed and Mr. Nichols read it over he read it over rather swiftly and some of it we didn't quite understand, and he read it more slowly, and Mrs. Harvey says, 'Now, does that, I didn't quite understand about that there was a half inch of water to the land to the

acre,' and Mr. Nichols turned the paper around and says, 'Oh, yes, here it is, eighty inches of water to the hundred and sixty acres,' he says, 'That is just the same.' And she turned it around so she could see it and read it. * * And she says, 'Now that much, that much for the year?' He says, 'For the irrigation season.' That meant as long, what I understood it, was as long as they were irrigating each season.''

She likewise imputes to Campbell the statement at the bridge that some of the water had been turned off above, and she says she knew at the time they were not doing so much irrigating. On cross-examination she said:

"Mr. Campbell said if they got any more water all they had to do was to turn it in, but he said there would be no more expense to the land, just taking some more out there, there was no more expense to it except to clean the ditch and pay the ditch walker to walk the ditch during the irrigation season."

Wheeler testified to this effect:

"Well, he told her there was a good water, the best water right in all of the state, the oldest water right, and it was good land and had a half inch of water to the acre, which was plenty for this kind of land, which I agreed with him all the way through. She inquired about that and he said there was plenty of water in the ditch and the ditch was on the place and if they wanted any more water to turn it on."

Wheeler claimed that he knew nothing about whether the ditch was large enough to carry 750 inches of water or not, but took Campbell's word for it. He testified that he had "never seen the ditch only the one place at Sparta, and that will carry twice the amount of water coming any time." He

says he was never above Sparta until the next year, and that he never heard anything about enlarging the ditch until the next fall, "never dreamed of it."

The defendants opened their case by introducing a sheriff's deed dated July 11, 1914, whereby that officer conveyed to the defendant Sparta Irrigation Company certain real property and "also that certain ditch and water right known as the Sparta canal or Sparta ditch, and the Hogum ditch, being a feeder to the Sparta canal or ditch, and all the lateral ditches, feeders or water rights to said Sparta canal or ditch and to the Hogum ditch, and all ditches, water rights, easements, and franchises appendant and appurtenant or thereunto appertaining to said ditches and water rights aforesaid; and also all reservoirs used in connection with said ditches and water rights, together with all improvements, tools, pipe line and all other equipment belonging thereto."

The next instrument introduced by the defendants was a deed dated July 30, 1917, from Robert M. Warnock and his wife to the defendant Floyd J. Campbell, of the 760 acres heretofore mentioned, which deed after describing the land by legal subdivisions contains in the descriptive part the following:

"Also that certain water right to the amount of 376½ miner's inches of water measured under six-inch pressure, taken out of what is known as the Sparta ditch in Baker County, Oregon, as such water right is measured and defined by the state water board of the state of Oregon on the 17th day of November, 1915, in its findings of fact and adjudication of the rights of the various claimants to the waters of Powder River, and also a *pro rata* share of not to exceed 250 miners inches of water allowed in said decree in the discretion of the water master for

and on account of seepage, all in Baker County, and state of Oregon.''

After reciting certain mortgages concerning which there is no dispute, the Warnock deed to Campbell contained the following:

"And the grantors do covenant to and with the grantee that they will and their heirs, executors, and administrators shall warrant and forever defend the above granted premises and water rights, and every part and parcel thereof, against the lawful claims and demands of all persons whomsoever,''

excepting the mortgages mentioned, which the grantee assumed and agreed to pay.

The defendants also introduced the findings of the water board and the decree of the Circuit Court in pursuance thereof in the adjudication of the rights of the claimants to the waters of Powder River and its tributaries. One of these affluents is Eagle Creek, from which the Sparta ditch derives its water. The findings and decree are to the effect that the contestee, the predecessor in interest of the defendant Sparta Irrigation Company, should take all of the waters awarded in these proceedings, from the west fork of Eagle Creek, and the natural tributaries thereof flowing into said stream above the head of what is known as the Sparta ditch, and any and all of the feeders of the said Sparta ditch heretofore and now feeding said ditch.

"And it appearing that the contestee is the successor in interest and owner of the water right used in connection with the Sparta and Hogum ditches, that in 1863, water was appropriated and thereafter used through the Hogum ditch; and that in November, 1870, William H. Packwood and Alex Stewart posted a notice on Eagle creek appropriating 3,000

inches of water for what is known now as the Sparta ditch; that thereafter the Sparta ditch was surveyed and on the 11th day of May, 1871, construction of said ditch was begun and water was run through said ditch to the town of Sparta, Oregon, on the 14th day of October, 1871; that said appropriation was for domestic, mechanical, mining and irrigation purposes; that upon the completion of said ditch there was at one time 800 miner's inches of water delivered to the water users out of said ditch, and the diversion of said water into said ditch, at the time same was used to full capacity was between 1,000 and 1,500 inches; that in 1871, the Hogum ditch was extended to empty its waters into the Sparta ditch, and was purchased by the owners of said Sparta ditch at said time; that from the building of said ditch until 1914, the water of said Sparta ditch was sold each year by the owners thereof, for the purposes of domestic, mining, power and irrigation use; that beginning with the year 1915 the owners of said ditch proposed to apply the water from said ditch partly upon the lands described in the tabulation hereinafter, amounting to 1500 acres; that 750 miner's inches of water delivered on the land is sufficient to irrigate the lands proposed to be irrigated; that the change of use of water from sale for domestic, mining, power and irrigation use, to an irrigation use, does not infringe upon the rights of any other water user from Eagle Creek, and in making said change said George Grant, trustee, and the water users from said Sparta ditch have the right to use a reasonable time for making said change without losing their date of priority; that five years is such a reasonable time, and the lands to be irrigated in making such change shall be tabulated herein under the head of Inchoate Rights."

The findings and decree also incorporate as part thereof the determination of the court in litigation related to the Hogum ditch, whereby part thereof was awarded to Cranston and Ingle and the remainder to

the Sparta Irrigation Company, reciting that the decree found that:

"750 miner's inches of water under six-inch pressure diverted to the place of use was sufficient water to irrigate the lands of the stockholders of said Sparta ditch company; that said Sparta ditch is thirty miles in length; that the seepage in said ditch would be great; that a reasonable seepage to be allowed for the Sparta ditch would be about 250 miner's inches; and that the water master of the district shall allow for seepage in the distribution of water such an amount as such seepage aggregates, not to exceed 250 miner's inches."

The 1,500 acres of land mentioned were tabulated in the decree as stated.

Over the objection of the plaintiffs that it was irrelevant, incompetent and immaterial and that it was not binding in any way upon the plaintiffs in this case or either of them, the defendants offered a certificate of water right issued to F. W. Tallmadge and L. W. Tallmadge, the predecessors in interest of the defendant Campbell in the ownership of the 760 acres of land which he purchased from Warnock; which certificate is on the form heretofore set out. The defendants further offered in evidence an abstract of title covering the 760-acre tract, showing title in Robert N. Warnock as of date July 17, 1917, which the defendant Campbell claims, and the plaintiff Mrs. Harvey denies, was shown to and examined by her prior to the purchase of the land. Also the defendants read in evidence an opinion of Charles A. Johns on the validity of the water right appurtenant to the 760-acre tract, which opinion, Campbell testifies and Mrs. Harvey denies, was exhibited to her prior to the purchase. Campbell then testified in his own behalf

to the effect that after Wheeler had arrived on the place he told the latter that he, Campbell, had been up the ditch and:

"We figured there was 500 inches of water coming through the ditch at that time, but that the land according to the decree was entitled to 750 inches when the ditch was improved to carry it. I told him we were entitled to a little more than half of it. He said that it was sufficient to water it, if we would have gone at it, if it was handled properly. I told him each one of the different ones interested in the land and the ditch were to receive their proportionate share of the water coming through the ditch at any time."

As throwing some light on the situation at that time, it appears in testimony by Arthur Boyd, a witness for the defendant Campbell, that at that time there were close to 300 acres under cultivation out of the 760. Mrs. Wheeler puts it at 304 acres.

Campbell testifies that he agreed to give Wheeler $5 per acre, if he would sell all or any part of the land at $90 per acre. He also testifies that he discussed the purchase of the land with Mrs. Harvey at the house on the place at different times, but was never over the land to show it to her or the Wheelers himself. He says he showed her the Warnock abstract, that she had it and perused it, and asked him a few questions about it for three or four days. He also says he gave her the Johns opinion respecting the title to the land and right to the water, and that after her deed was recorded he gave her a separate abstract. He says he told her she would receive with her deed 53⅓ shares of stock, which would represent her interest in the Sparta Irrigation Company and which would entitle her to 53⅓ five hun-

dredths of the property of the ditch company and 53⅓ five hundredths of the water coming through the ditch at any time. He testified about the trip to the diversion dam and showing the various ditches diverting water there, and explained that they estimated 500 inches of water were coming down. He narrates the trip to the Sparta bridge and says he told them he had measured the water on August 11th and 12th at 500 inches, and testified thus: "and Mr. Wheeler said right at that time that it was enough water to water the land, if they never got any more, if it was judiciously handled." He declares he told Wheeler at the time they were up there that "we estimated the ditch could be enlarged for $4,000." Speaking of the plaintiff Mrs. Harvey, he says:

"That was discussed at the house and up on the ditch the day we went to the division dam. * * That there was the 500 inches coming now down the ditch and that by making this enlargement there could be 750 more inches upon the land for the 1,500 acres and that there was a thousand inches allowed at the head of the stream, 250 inches being allowed for seepage and evaporation and if it didn't seep or evaporate that we would be entitled to that much more. That they understood distinctly."

He testified further that upon going to Baker to have the deed prepared he referred Mrs. Harvey to Mr. Nichols as knowing all about the decree and water right, and told Nichols "to draw the deed the same as the one Warnock gave me, and Nichols went to the courthouse and got an exact copy." The deed was dated October 8, 1917.

Campbell went on to testify that the cost of enlarging the ditch and the matter of allowing an irriga-

tion district to take it over were discussed in Mrs.
Harvey's presence at the meeting of the stockholders
of the corporation in February, 1919, and it was said
at that meeting that the ditch was carrying less than
500 inches of water. He declared that Wheeler cul-
tivated the lands of Mrs. Harvey, Mrs. Dunne and
Wheeler during the year 1918, and was allowed to
rotate the water on all three tracts, and that Mrs.
Harvey first complained to him about the lack of
water in the fall of 1919. He testified:

"She says that she was entitled to 80 inches all
the time regardless of what her proportionate share
on the basis of her shares in the ditch company."

On cross-examination he was interrogated about
some conversation he had with some men named
Lasco and Forsea, with whom he had negotiations
about purchasing the 160 acres he afterwards sold to
Mrs. Harvey. He said he "couldn't say as to
whether he told them or whether they asked" how
much it would cost to get the water from year to
year. He said he "didn't believe" he told them the
maintenance of the ditch would not exceed $75 per
year for their share. He said he "wouldn't say"
anything about whether Mrs. Harvey mentioned the
water to him particularly and wanted to be sure that
there was that water, but he said he told her that she
was getting about two-thirds of the amount of the
water to which the land was entitled and that she
would get her 53⅓ five hundredths of the water that
was coming through the ditch; also, "I think I told
her we had estimated four thousand dollars to enlarge
the ditch." He testified:

"I told her this land had been allotted a half inch
of water, in answer to one of her questions, by the

state water board, and it had been decreed to the land by this court and it was her share of the water when the ditch carried that much; and that the right to the ditch I thought would never be questioned because of it having been stipulated; that this was all in answer to questions. * * I told her she was buying the land subject to the allotment of the state of a half inch of water, that she was going to get certificates of stock in the ditch to the amount of 53⅓ shares which would entitle her to 53⅓ five hundredths of the water that came down or through the ditch at any time."

The witness closed his testimony with the questions and answers already quoted, respecting the frame of the deed which he delivered to Mrs. Harvey.

Arthur Boyd, a witness for defendants, testified to having a conversation with the plaintiff Wheeler prior to October, 1917, soon after he came to Baker County, and declared:

"I told him I thought we had one of the best water rights in the country when we enlarged our ditch so that we could get more water, get the water the state allowed us, and he said that if we would use our water properly at that time that he believed we had plenty to raise good crops with."

On cross-examination he testified he was irrigating about 100 acres at the time and had water to cover his entire 160 acres; that Campbell had close to 300 acres under irrigation, with a water right for 760 acres, about half the land for which there was a water right.

Ray Boyd testified that in the latter part of September, 1917, he told Wheeler "what a good water right we have, and although we were not getting one half inch of water as we were entitled to, and wouldn't until we enlarged our ditch, and he said that if we

would use the water properly, that he believed we could irrigate all of the land under the ditch at that time with the present head of water." The witness also narrated the transaction at the February, 1919, meeting of the stockholders of the defendant corporation, concerning the subject of the proposal of the irrigation district to take over the ditch, and that Mrs. Harvey made no objection.

Mr. Nichols, the attorney who drew the deed in question, was called as a witness for the defendants, and after stating his familiarity with the litigation resulting in the adjudication and decree respecting the users of water from Powder River and its tributaries, including the stockholders of the defendant company, speaking of the visit of the parties to his office, testified as follows:

"Mr. Campbell, Mrs. Wheeler, Mr. Wheeler and Mrs. Harvey came to my office and advised me of the fact that they had made a deal for a tract of one hundred and sixty acres of land under the Sparta Ditch. It is my best recollection that Mr. Campbell told Mrs. Harvey in my presence of my knowledge and in a general way of my experience with the affairs of Sparta Irrigation Company and with the Sparta Ditch. Mrs. Harvey interrogated me with respect to that water right. She didn't seem to be concerned with the question of the title to the land, but she was concerned with the history of the Sparta Ditch and of that water right, and she asked me a great many questions, and so did her brother-in-law and so did Mr. Campbell respecting the history of that ditch and that water right, and we discussed it there at length and I answered a great many questions for Mrs. Harvey that day, the details of all of which I am unable to recall, but I know I did the best I could to give her all the information I possessed regarding that ditch and water right."

This witness identified the abstract already mentioned, showing title in Warnock, said he had examined it on October 31, 1916, and went on to say:

"With respect to this abstract, my recollection is, and in fact, I am confident that this is true, that Mrs. Harvey had examined this abstract and that she had also examined my written opinion of title which accompanied it at that time and the opinion of title to the land and also to the water right furnished to Mr. Campbell by Charles A. Johns. I recall that particularly because of the fact that Mrs. Harvey expressed to me in that conversation her satisfaction with the title to the land, and that came about as I recall it, at least I got the impression from Mrs. Harvey that that was purely by reason of the fact that she had examined this abstract and the opinions of title to which I have referred. In the course of our conversation that day in the office and in connection with Mrs. Harvey's questions to me concerning the water right, reference was made to the certificate of water right which is set forth in this abstract on pages 2 and 3 of the first continuation thereof. I do not recall whether Mrs. Harvey brought this matter to my attention or whether Mr. Campbell spoke of it or whether I took it up and called it to the attention of Mrs. Harvey, but it is my best recollection that this certificate of water right was discussed and particularly that the provision of this certificate which recites that each of the shares of stock in the Sparta Irrigation Company, a corporation, entitled the holder to a proportionate interest in the water available in the Sparta ditch."

He says concerning the Johns opinions:

"I know that both of these documents were exhibited to me at that time and were available there, and, in addition, my own written opinion on the title of this land was also there at the time, and those instruments were the subject of discussion between us. * * Now, I recall one feature of that

discussion particularly. There was nothing in these abstracts, or in the opinions of title or in any of the conveyances, as I recall it, that said anything about the Hogum ditch, and the fact that it had been conveyed to Phillips and Ingle, and I explained that transaction. There may have been some reference to it in Mr. Johns' opinion of title to the ditch, but I know that I explained the fact that the Sparta Irrigation Company had parted with some of its property right in that ditch and that at that time and in Mrs. Harvey's presence I gave them a general history of that ditch and explained to her my understanding and interpretation of the findings and order of determination of the state water board and of the decree of the Circuit Court based on that order of determination with particular reference to the fact that certain work must be prosecuted on that ditch within the period of five years from the date of the order of determination, and I not only did it with Mrs. Harvey at that time but as she well knows, I did it at every subsequent meeting of the Sparta Irrigation Company from that time down to the time this work was actually undertaken and prosecuted, and I urged with great insistence in Mrs. Harvey's presence at those meetings that this work be completed, commenced and prosecuted to completion to the end that that right be preserved. I recall that I advised Mrs. Harvey regarding the date of the appropriation of the Sparta Irrigation Company, the date of the initiation of the Sparta Irrigation Company's water right. I think I commented on the fact that it was an old right, one of the oldest in the county, and in a general way I explained to her the conditions as I knew them to exist on the Sparta ditch at that time.''

It will be noted that in the testimony above quoted there is no declaration of the witness that he gave any particular legal effect to the transactions in his interview with Mrs. Harvey, which he describes. His

testimony as to the conversation does not disclose that anything was said about eighty inches being construed as a mere proportional part of an unknown and potential flow of water.

Further the witness said:

"When the question of the preparation of a deed came up Mr. Campbell instructed me to prepare that deed in the same manner as the deed which he had received was prepared with particular reference to the water right as described in that deed and the manner of its description, and I went to the county records here in the court house, took my note book in order to be sure about it and made a transcript of the deed which Mr. R. N. Warnock had given to Mr. Campbell with particular reference to the manner in which the water right was described."

On cross-examination, when called upon to state at what meeting of the stockholders of the irrigation company it was shown by the records, when any suggestion was made respecting enlargement of the ditch, he said:

"It appears in the minutes of the annual meeting of February 4, 1919,"

and then read from the record as follows:

" 'The matter of the status of the water right through the company ditch after the establishment of the proposed irrigation district in vicinity of Sparta under which proposed district the use of the Sparta canal is contemplated by said district was discussed, and the company's attorney advised that an effort should be made to have the irrigation district, as a part of the consideration for the use of the company ditch, by it, concede after enlargement the prior right of the company to the use of the waters therein to the extent of the amount awarded to said company by the Circuit Court of Baker County,

Oregon, without regard to the present or past carrying capacity of said ditch, and that a committee be appointed to put that matter before the representatives of said district.' And in parenthesis: '(to 750 of West Fork of Eagle Creek at the point of delivery)'. That much of it was omitted from the sentence."

In rebuttal, Mrs. Harvey denied ever having examined any abstract, or the Johns opinions, or that she ever saw the Nichols opinion or heard any reference to any water right certificate before she purchased the land. She admitted that Campbell told her he had such an opinion, but she never saw or examined it. She said that there was an agreement that Campbell would furnish her an abstract, and she received it in the latter part of December, 1917, and with it the recorded deed to the property. The abstract which she mentioned was introduced in evidence, and it is dated December 6, 1917. Respecting the stock, she testified, referring to Campbell:

"He said that with the land I would get 53⅓ shares of stock. He says, 'I am not selling you this stock. It just goes with the land. I can't sell the stock because it just goes with the land. This stock is just,—the reason we have it is just so you will have a voice in the upkeep of the ditch or the necessity for it.' "

She declares that the first time she saw the stock was in June, 1918. She says she found it then in the stock-book of the Sparta Irrigation Company; that it had been disconnected from that; that the book had been turned over to her in February, 1918, but she had not seen the inside of it; and that it had been left in Mr. Nichols' office all that time.

The stock certificate she described was read into the record as follows:

"Incorporated under the laws of the state of Oregon. No. 14. Shares, 53⅓. Sparta Irrigation Company. Capital stock, $22,500.00. This certifies that Mary C. Harvey is the owner of 53⅓ shares of the capital stock of Sparta Irrigation Company, transferable only on the books of the corporation by the holder hereof in person or by attorney by the surrender of this certificate properly indorsed. In witness whereof, the said corporation has caused this certificate to be signed by its duly authorized officers and to be sealed with the seal of the corporation this —— day of Oct., A. D. 1917. P. T. Wyatt, President; R. L. Boyd, Secretary."·

Mrs. Harvey disclaimed all knowledge of any proportional water certificate, as stated in the answer, and said:

"No certificate was handed to me to read or to see, and none was offered to me to sign. I never saw the certificate until I saw the record of the one in the record book after February, 1918, and I read. through the abstract after I received it in December, 1917."

She testified that the minutes of the meeting of the stockholders of the company of February, 1918, were made from notes by Mr. Nichols and some by herself in a private note-book, after she was elected secretary, and that they were written into the record book the following June by herself, and included all of Nichols' notes. She says that at the February, 1918, meeting, they were considering the proposition of allowing the irrigation district to enlarge the ditch, to carry water to other lands, with the consideration that the company be allowed its full 750 inches of water and the Sparta Irrigation District be required

to maintain the ditch from that time on, and that there was no direction to enlarge the ditch in order to carry 750 inches of water. She said she first heard in September, 1919, at the ranch, that there was any necessity for enlarging the ditch to secure 750 inches of water. She testified that Campbell said on that date, "I have just learned that we have a certain time to enlarge the ditch."

The opinion of Charles A. Johns respecting the water rights was addressed to Floyd J. Campbell, under date of July 27, 1917. He says in that paper that, having examined the abstract dated July 21, 1917, concerning the water rights of the Sparta Irrigation Company and Robert N. Warnock, he is of the opinion, based upon such abstract:

"That on the 21st day of July, 1917, the said Robert N. Warnock was the sole and exclusive owner of a 276½ inch water right from and out of the west fork of Eagle creek to and upon the following described lands, to-wit: * * *"

Then follows a description of the 760-acre tract. Further, the opinion goes on to state:

"That such water right and the amount thereof on the 17th day of November, 1915, was finally and legally adjudicated by the state water board of the state of Oregon, after a full and complete hearing thereon, in and to which all the persons interested were made parties, and after their respective claims were filed and the testimony was taken, contests were heard and determined, and it is my opinion that the adjudication of such water rights by the state water board is now final and conclusive.

"That in and by such findings and the decree of said board the said lands were awarded and decreed the right to the use of 376½ miner's inches of water under an appropriation for irrigation, mining and

power dating from 1870, and that in and by such findings the Sparta Irrigation Company has until the 1st day of January, 1921, in which to complete the application of all of such waters and to put them to a beneficial use on the said lands, and that it was found and determined by the said decree rendered by the state water board that the Sparta Irrigation Company, through its stockholders, had the right to irrigate 1542 acres of land and 'that 750 miner's inches of water under a 6-inch pressure delivered at the place of use was sufficient water to irrigate the lands of the stockholders of the said Sparta Ditch Company,' and that the appropriation right dated from 1870.''

Further on in that document it is said:

''The findings of fact and decree of the state water board contemplate and provide that the amount of 750 miner's inches of water shall be actually delivered to and upon the land of the stockholders of the Sparta Irrigation Company, and makes an allowance of seepage or loss in the transmission from the head of the ditch to the lands of not to exceed 250 miner's inches, and directs that the water master shall make an allowance for seepage in the distribution of the water not to exceed 250 miner's inches. In legal effect this would increase the amount of the appropriation at the head of the ditch for the use and benefit of the lands from 750 miner's inches to 1000 miner's inches if the water master should ascertain and determine that there would be a loss of 250 miner's inches through transmission or seepage of the waters to and upon the lands.''

The opinion concludes with this language:

''I have not seen the stock book or corporate records of the Sparta Irrigation Company, but I am advised that Robert N. Warnock is the owner and holder of 51/100 of any and all of the capital stock of the said Sparta Irrigation Company, and in the event

that he is the owner and holder of such stock it is my opinion that he has a good and valid water right to 376½ inches of the waters of the west fork of Eagle creek dating from the year 1870, delivered to and upon the said lands, together with a right to irrigate said lands with the said water.''

We recur now to the language of the deed from Campbell and his wife to Mrs. Harvey, respecting the water right, reading thus:

''And also 80 inches of water measured under six-inch pressure of that certain water right taken out of what is known as the Sparta ditch in Baker County, Oregon, as such water right is defined and measured by the state water board of control of the state of Oregon, in its findings and adjudication in the matter of the adjudication of the rights of various claimants to the waters of Powder river and its tributaries; also a *pro rata* interest in 250 inches of water allowed to the Sparta Irrigation [Company] under its appropriation through said ditch in the discretion of the water master to cover seepage and loss of water in transit from the point of origin to the point of delivery.''

The *habendum* clause and warranty follow:

''To have and to hold the said premises with their appurtenances, unto the said Mary C. Harvey, her heirs and assigns, forever, and we, the said Floyd J. Campbell and Minnie D. Campbell, his wife, grantors, herein, do hereby covenant to and with the said Mary C. Harvey that we are the owners in fee simple of said premises; that said premises are free and clear of all encumbrances [except mortgages which are not in question]. * * And subject to the above encumbrances, the said grantors herein will warrant and defend the title to the property herein conveyed from all lawful claims whatsoever.''

Section 717, Or. L., reads thus:

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

It is said in *Christensen* v. *Pacific Coast Borax Co.,* 26 Or. 302 (38 Pac. 127):

"While a court, in construing a contract, may take into consideration the situation of the parties, the object they must have had in view, and all the surrounding circumstances, still the language of the instrument must determine to what the parties have bound themselves."

In *Salem King's Co.* v. *Ramp,* 100 Or. 329, 356 (196 Pac. 401), it is said:

"Where the language of the contract is ambiguous, equivocal or reasonably susceptible of two or more conflicting constructions, it is competent to resort to parol testimony concerning the circumstances under which the agreement was made or to which it relates, including the situation of the subject of the instrument and of the parties to it, in order, not to add to or detract from or otherwise vary the terms of the instrument, but to enable the court to ascertain what the meaning of the parties really is."

On its face, the language of the deed describing the water right is ambiguous to the extent that it refers to the adjudication of the rights of various claimants to the waters of Powder River and its tributaries. To that decree, therefore, we are remitted for an explanation of the situation. On examination we find that the decree was dealing with water rights in actual enjoyment, not potential or prospective in their nature, but those which were being used and

operated by the owners of the ditch at that time. It declares that the ditch at full capacity, contained between 1,000 and 1,500 inches of water and that 800 miner's inches were delivered to water users out of the ditch; that the original declared use of the ditch was for domestic, mechanical, mining and irrigation purposes, which continued until the beginning of the year 1915, when the owners proposed to apply the water partly upon the lands described in the tabulation, amounting to 1,500 acres. The decree declared that 750 miner's inches of water delivered on the land was a sufficient supply for the irrigation thereof, and allowed 250 additional inches to make up for the loss by seepage and evaporation. The only potential feature about the matter, and which alone caused the lands to be listed in the tabulation under "inchoate rights," was the matter of changing the water from previous uses to that of irrigating the 1,500 acres of land. The amount of water present for application to the new project and the capacity of the ditch were actualities as declared in the decree.

We recur again to the language of the deed, where it refers to the water right as "defined and measured by the state water board of control of the state of Oregon." The water must have then been in present use, else it could not have been measured. There is no hint in the decree about abandonment of the original right initiated in 1870. No suggestion is made that the canal had lost its capacity. If at the time of the adjudication the water was not employed and the original right had depreciated, so that it was not in actual use, either wholly or in part, the board would have found accordingly and limited the decree to the lesser quantity then in use. It is a well-

established principle that water must be put to an actual beneficial use or there can be no appropriation. Waste and absence of beneficial use are anathema in irrigation. Hence we must conclude that the ditch was there and the water was there for the court to act upon by its decree as real entities and not as mere potentialities yet to be worked out to realization.

Another feature is noticeable in the deed. The plain language is, eighty inches of water. There is no proportional or relative value given to that term. It is fixed, and this is all the more conspicuous because in the following clause there is mentioned a *pro rata* interest in an additional 250 inches allowed for seepage and evaporation. It is scarcely credible that if the grantor intended to convey only a proportional interest, he would have used the term *"pro rata"* in one instance and not in the other.

7. Adapting ourselves to the situation of the parties as disclosed by the testimony and the pleadings, we find that the defendant Campbell was at the time of the execution of the deed in constant receipt upon his land of a quantity of water largely in excess of eighty inches. This is admitted in the pleadings. It was his property and he had a right to sell it. As it was appurtenant to the whole 760 acres, he could use it wherever on that tract he chose to use it, limited only by the principle that the use must not be wasteful. It may be said that in this instance he could not use more than one-half miner's inch to the acre, that being the adjudicated limit. Up to that amount, at least, he had the right to sell any specified portion of his allowance of water with any designated part of the land to which this allowance was apportioned. As expressed in the deed which he testified

was drawn just as he directed it to be drawn, this is just what he did. Under the guise of placing ourselves in the position of the parties thereto, we cannot contradict the avowed language of the instrument. Where it states a fixed and exact quantity of water, we cannot say that as between the parties to it, it means a proportional quantity, variable as extraneous circumstances may change. In respect to the place where a water user may employ the water on a tract of land to which it is appurtenant, it is said in *Santa Paula Waterworks* v. *Peralta*, 113 Cal. 38 (45 Pac. 168), that it was erroneous to limit the defendant's use of one half an inch of water to the place where his house was located, the water being available for use on any portion of the defendant's lands. In *Wimer* v. *Simmons*, 27 Or. 1 (39 Pac. 6, 50 Am. St. Rep. 685), it was held that an appropriator may change the place of the use of water. In *Whited* v. *Cavin*, 55 Or. 98 (105 Pac. 396), it was ruled that while not necessarily confined to the same specific tracts upon which the water has heretofore been applied, the appropriators are restricted to acreage upon which the appropriation was perfected at the time of the inspection of the water rights of the answering defendants. In *Williams* v. *Altnow*, 51 Or. 275 (95 Pac. 200, 97 Pac. 539), it was held that a prior appropriator of water for a beneficial use from a stream or other natural source of supply may change the point of diversion or the place of use, so long as he does not prejudice the rights or use of subsequent claimants.

In *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777), the rule is laid down thus:

"A sale or transfer of the whole or part of a completed appropriation of water may be made, either

in connection with or separate and apart from the land in connection with which the water was originally used.''

*Booth* v. *Trager*, 44 Colo. 409 (99 Pac. 60), is an example of giving to every small tract its proportion of water coming in the main irrigating ditch when a larger tract is subdivided and nothing more is said in the deed with regard to the small tract than ''with the appurtenances,'' or, as in that instance, ''together with all water and ditch rights and privileges thereunto belonging.'' But in *Davis* v. *Randall*, 44 Colo. 488 (99 Pac. 322), the same court and the same judge writing the opinion, Mr. Justice CAMPBELL, treating of a subdivision of a larger tract with a specified amount of water in inches included in such conveyance, said:

''The grantee, therefore, only takes such water rights as are by the express terms of the contract of conveyance described.''

It is but a quibble to undertake to distinguish between water and the use of water. Indeed, all that anyone acquires in regard to water, at least in irrigation, is the use of it. The very essence of appropriation is the diversion of water to a beneficial use. All else is outside the pale of appropriation. So, when we speak of a given quantity of water in inches, we mean the use of that amount of water in continuous flow to be applied to the subject of the appropriation.

We note also in the deed that the defendant Campbell and his wife ''do hereby covenant to and with the said Mary C. Harvey that we are the owners in fee simple of said premises.'' It is said in *Steinhardt* v. *Burt*, 27 Misc. Rep. 782 (57 N. Y. Supp. 751):

"The term 'premises' is used to signify the land with its appurtenances, but its usual and appropriate meaning in conveyances is the thing demised or granted by the deed."

" 'Premises' in a popular phrase is sometimes used for land, but 'the premises' in the connection in which it is used here means that which is conveyed": *Holbrook* v. *Debo*, 99 Ill. 372, 381. In that instance the language was, "all such right, estate, title and demand whatsoever as I have." It was there held that the language did not purport to convey the lots themselves, but merely the right of the grantor thereto. *Deavitt* v. *Washington*, 75 Vt. 156 (53 Atl. 563), was a case where the deed to a house and lot conveyed to the grantee an easement consisting of the right to use the dooryard in common with the occupant of an adjoining lot. It was held that the word "premises" in the *habendum* clause of the deed included the easement and that the easement ran with the land. The language of the covenant here involved means that the grantors are the owners of that amount of actual water for use upon the land described.

Again, Campbell and his wife stated in their deed that "the said grantors herein will warrant and defend the title to the property herein conveyed from all lawful claims whatsoever." In *Huyck* v. *Andrews*, 113 N. Y. 81 (20 N. E. 581, 10 Am. St. Rep. 432, 3 L. R. A. 789), it is held that "covenants in a deed protect the grantee against every adverse right, interest or domain over the land, whether he had notice of such adverse interest or not." So here, where the grantor conveyed, as he did, a specified quantity of water, covenanting that he was the owner thereof and likewise that he would warrant and defend the title

to the property from all lawful claims whatsoever, he erected an insuperable barrier in favor of the grantee against all claims and especially those of the grantor himself that would lessen the quantity of water thus warranted. It is said in *Wilson* v. *McEwan,* 7 Or. 87, that a grantor and his privies are estopped from denying title to which they have given general warranty. In construing a mortgage in *Meier* v. *Kelly,* 20 Or. 86, 93 (25 Pac. 73), the court, speaking by Mr. Justice Robert Bean, said:

"But in our construction of the mortgage we are confined to the intention of the parties as gathered from its contents. As a matter of construction we cannot change or vary the description actually contained in the mortgage, although it may be plain that it is not the description intended to be inserted therein. Where the terms used in the description contained in a deed or mortgage are clear and intelligible, the court will not put a construction on the terms, and parol evidence is not admissible to control the legal effect of such description."

As said in *King* v. *Holbrook,* 38 Or. 452, 461 (63 Pac. 651):

"It would be the height of injustice to alter a contract on the ground of mistake, where the mistake arises from misconception by one of the parties in consequence of his imperfect explanation of his intentions."

In *Taggart* v. *Risley,* 4 Or. 235, according to the syllabus, it is the rule that "if the seisin or possession of a particular estate is affirmed in a deed, either in express terms or by necessary implication, the grantor and all persons in privity with him will be estopped from ever afterwards denying such seisin or

possession." Again, it is said in *Gardner* v. *Wright,* 49 Or. 609, 624 (91 Pac. 286), a case dealing with conveyances of water rights, that:

"The general rule is recognized to be that, when a person assumes to convey property by deed, he will not be heard for the purpose of defeating the title of the grantee, to say that at the time of the conveyance he had no title and that none passed by the deed. Nor can he deny to the deed its full operation and effect as a conveyance."

We thus have a case where the grantor, Campbell, was possessed of a quantity of water, or the use thereof, greatly in excess of eighty inches, which was appurtenant to the tract of 760 acres of land. He himself had the right to use that water, at least to the limit prescribed by the decree, namely, one half an inch to the acre, on any part of that land. That same right he could and did sell to Mrs. Harvey. He was not required to apply a proportional part over the whole estate. He could sell any part of his acreage with enough water to give it the full appropriation alluded to by the decree. If the consideration paid to him, which the evidence shows to have been $90 per acre, was sufficiently tempting, he could sell all or a part of both land and water.

The question of the duty of the plaintiff Harvey to pay for such enlargement or repair of the ditch as may be ordered by the corporation is not before the court. That may or may not be a question between that concern and her in some future litigation, but it is not here. Neither is it a question of what recourse Mrs. Harvey would have against the defendant Campbell on his warranty in the deed, if she should be compelled to help enlarge the ditch so as to

acquire some greater amount of water.  Nor is there presented to us in this suit the matter of distinguishing between mere upkeep of the canal and an enlargement thereof.  All those things merely cloud the issue.  The only question is this: What did Campbell convey to Mrs. Harvey by his deed?  And shall he be allowed, or not, to violate his covenant by lessening the amount of water which he conveyed to her?

It is of but little moment whether Mrs. Harvey saw the abstract and the Johns opinion, or not. Campbell says and she denies that she saw them. But if she did, what would she find in the opinion? One fact was, that on July 21, 1917, Warnock was the sole and exclusive owner of a 376½ inch water right from out of the west fork of Eagle Creek, appurtenant to the land here involved; further, that it was the opinion of the writer thereof that the adjudication of such water right by the State Water Board "is now final and conclusive"; that the findings of fact and the decree of the State Water Board contemplate and provide that the amount of 750 miner's inches of water shall be actually delivered to and upon the lands of the stockholders of the Sparta Irrigation Company; and finally, the opinion is that Warnock "has a good and valid water right to 376½ inches of the waters of the west fork of Eagle Creek, dating from the year 1870, delivered to and upon the said lands, together with a right to irrigate said lands with the said water."  All this Warnock conveyed to Campbell with full warranty. What impression could anyone gain from such an opinion based upon the abstract, other than that the owner of that right was not proportioned in common with anyone else?  The deeds involved explicitly

describe warranted estates in severalty as to the water conveyed.

The defendant Campbell seeks to overcome the testimony on behalf of the plaintiffs by quoting Wheeler's statements that the water was sufficient for irrigation if handled properly. Some considerations of that testimony are *apropos*. In the first place, at that time Wheeler was the agent of Campbell to effect a sale of the lands and their appurtenances. Under such circumstances, Wheeler's declarations were the declarations of Campbell himself, for they were made during and as part of the negotiations culminating in the sale. Wheeler makes the statement conditional on what Campbell had said, that there was plenty of water and the apportionment was one half an inch per acre. Wheeler had never seen any part of the ditch at that time, except what was then before him at the place near Sparta. The testimony is that Campbell there declared that part of the water had then been turned off above, owing to the close of the irrigation season. Campbell does not dispute this statement imputed to him. Wheeler, speaking of the ditch at that point, says it was large enough to carry double the amount of water then flowing through it, which Campbell said measured 500 inches after some had been turned off above.

It is not necessary to attempt to reconcile all these various and varying accounts of the oral negotiations leading up to the execution and delivery of the deed, for they are all merged in that document (Section 713, Or. L.). Especially is this true where the grantor avows under oath that the conveyance is couched in the exact terms he directed to be used. The decree adjusting the distribution of the water, the opinions of his counsel and the deed from his immediate

grantor, all of which he claims to have brought to the attention of Mrs. Harvey, lead inescapably to the conclusion that he had an estate in severalty in 376½ miner's inches of water of continuous flow to be taken from the Sparta ditch and delivered on the land. By his warranty deed, framed exactly as he directed, he has conveyed eighty inches of his estate in that allowance to Mrs. Harvey and is bound by the legal effect of his deed.

In respect to the water certificate: not even Campbell himself says anything about a "water certificate," but speaks continually of shares of stock. The only thing like shares of stock appearing in the testimony affecting Mrs. Harvey is the certificate which she found in the stock book, not detached but dated "the —— day of October, 1917," and signed by the then officers of the company, and it does not say anything whatever about proportional interests in water. There is no pretense in the testimony that any such water certificate was ever presented to Mrs. Harvey for her signature or acceptance [and consequently by its terms it did not and could not bind anyone who did not sign it].

Again, by the pleadings it is stated that this so-called water certificate was a creation of the stockholders and not of the directors of the defendant corporation. It is said in Section 6867, Or. L.:

"From the first meeting of the directors, the powers of the corporation are exercised by them or by their officers or agents under their direction, except as otherwise specially provided in this chapter."

Under this rule it was held that the directors and not the stockholders must exercise the authority of the corporation: *Guillaume* v. *K. S. D. Land Co.,* 48 Or. 400 (86 Pac. 883, 88 Pac. 586); *Baillie* v. *Columbia*

*Gold Mining Co.,* 86 Or. 1 (166 Pac. 965, 167 Pac.
1167). Here was the holding company, possessed of
the title to the ditch and water rights; true enough,
for the benefit ultimately of its stockholders. But
the authority to control the water within its cor-
porate powers was vested in the directors and not in
the stockholders; hence, the deduction under the pre-
cedents is, that the action of the stockholders is
without authority.

And above all, the question is not here between
either Campbell or Mrs. Harvey and the other stock-
holders, who hold lands other than the 760-acre tract.
A quantity of water in excess of eighty inches was
separated from that mass and delivered to that tract
of land in severalty while in the ownership of Camp-
bell. It was his, to do with as he pleased, and he has
sold a specific part of it, not an undivided propor-
tional interest. The question is, whether he shall be
permitted repeatedly to violate his own covenant.
It is true that the corporation of which he is a mem-
ber and stockholder is not a party to the deed; but
as he can be restrained from violating his covenant,
so also may the company be prevented from doing the
same act whenever it undertakes to assist him in
such wrongdoing. By its answer, evidently framed
at his dictation, it avows the right to do what he is
doing; and having launched itself thus with a wrong-
doer, it is within the power of the court to enjoin it
so far as it is acting in furtherance of his designs.
The acts of Campbell in diminishing the quantity of
water which he warranted to Mrs. Harvey, indorsed
as they are by the company, amount to repeated and
continued trespasses the perpetration of which equity
will enjoin under such precedents as *Chapman* v.
*Dean,* 58 Or. 475 (115 Pac. 154); *Stotts* v. *Dichdel,*

70 Or. 86 (139 Pac. 932); *Central Oregon Irrigation Co.* v. *Whited*, 76 Or. 255 (142 Pac. 779, 146 Pac. 815); *Talbot* v. *Joseph*, 79 Or. 308 (155 Pac. 184); *Barnes* v. *Esch*, 87 Or. 1, (169 Pac. 512); and *Boulevard Drainage System* v. *Gordon*, 91 Or. 240 (177 Pac. 956, 178 Pac. 796).

It is not by the mark to contend that we should be piling adjudication upon adjudication in declaring the effect of the deed from Campbell to Mrs. Harvey and awarding her eighty inches of water. She was a party to the former adjudication, and that decree did not contemplate a subdivision of the part awarded to Campbell's land which is here involved. The decree that the plaintiff Mrs. Harvey is the owner of the water right to the amount of eighty inches would be one settling the rights of Campbell and herself as defined in the deed. The decree of the Circuit Court should be reversed and one here entered according to the prayer of the complaint.

Mr. Justice RAND did not participate in the hearing or decision of this case.

REVERSED AND DECREE ENTERED. REHEARING DENIED. MOTION TO RETAX COSTS DENIED.

HARRIS, J., Dissenting.—This suit was begun by Mary C. Harvey and S. S. Wheeler; but inasmuch as Wheeler was only a tenant, the word plaintiff, when used, will be employed to indicate Mary C. Harvey.

The suit terminated in the Circuit Court in a decree which was adverse to Mary C. Harvey. An appeal to this court resulted in an affirmation of the decree. A petition for a rehearing was granted, and the parties again orally argued to this court their

contentions. At the rehearing no new thought was advanced by either party, and no argument was made which had not been previously urged upon us. The rehearing therefore requires a re-examination of the evidence and calls for a reconsideration of the same arguments which were considered at the first hearing and repeated at the second hearing.

The decision of this lawsuit must be determined by whatever construction is placed upon the deed made by Floyd J. Campbell and his wife to Mary C. Harvey on October 8, 1917. That deed so far as it is material here reads as follows:

"The West Half (W. ½) of the South East Quarter (SE. ¼) and East Half (E. ½) of the South West Quarter (SW. ¼) of Section 25, in Township 8 South, Range 43 E. W. M., in Baker County, Oregon, containing 160 acres of land; and also 80 inches of water measured under six inch pressure of that certain water right taken out of what is known as the Sparta Ditch in Baker County, Oregon, as such water right is defined and measured by the State Water Board of Control of the State of Oregon, in its Findings and Adjudication in the matter of the Adjudication of the rights of various claimants to the water of Powder River and its tributaries; Also a *pro rata* interest in 250 inches of water allowed to the Sparta Irrigation (Company) under its appropriation through said ditch in the discretion of the water master to cover seepage and loss of water in transit from the point of origin, to the point of delivery."

In this deed Campbell covenants that he is the owner in fee simple of the premises, and that they are free from all encumbrances except a mortgage executed by the Sparta Irrigation Company to the Grand Rapids Trust Company on October 3, 1914 and the supplementary mortgage "between the same

parties, of date October 3, 1916," which mortgages Mary C. Campbell "assumes and agrees to pay her *pro rata* share thereof hereby fixed and agreed to be the sum of $2,400, with interest."

The controversy centers around the language in the deed referring to the water. The plaintiff insists that the wording found in the instrument is so plain and unambiguous as to exclude the consideration of any matters outside of the deed and that the clear and obvious meaning of the language is that the grantors intended to convey and the grantee intended to receive an absolute, definite and fixed quantity of water to be delivered during the irrigating season. As stated in the original opinion if the words "also eighty inches of water measured under six inch pressure" were the only words found in the deed, then the contention made by the plaintiff might have some foundation upon which to rest. But the words last quoted are not the only words found in the deed. Any reading, whether casual or the most careful, of the instrument, makes it clear, it seems to the writer, that no one can know with certainty exactly what is attempted to be conveyed without seeking information outside of the deed. If the parties had intended to convey the definite and absolute quantity of eighty inches of water so as to impose upon Campbell an obligation to deliver at all events eighty inches of water just as he would be obliged to deliver eighty bushels of wheat if he had agreed to sell eighty bushels of wheat, is it not manifest that the parties would have omitted the words

"of that certain water right taken out of what is known as the Sparta Ditch in Baker County, Oregon, as such water right is defined and measured by the State Water Board of Control of the State of Oregon,

in its Findings and Adjudication in the matter of the Adjudication of the rights of various claimants to the waters of Powder River and its tributaries.''

Indubitably the reference to the Powder River adjudication was made for some purpose. What then was that purpose? In order that we may ascertain, if possible, the purpose sought to be accomplished, let us inquire into the history of the Sparta ditch; let us ascertain what rights were acquired by the owners of the Sparta ditch, and let us seek to learn of the manner in which they exercised those rights; and let us acquaint ourselves with the facts and circumstances surrounding the conveyance from Campbell to Mary C. Harvey. In 1870 work on the ditch now known as the Sparta ditch was begun with the view of tapping waters of the west fork of Eagle Creek, a tributary of Powder River, and conveying them to a place known as Sparta, there to be used for mining purposes principally. The ditch was completed without delay, and the waters of the west fork of Eagle Creek were diverted through the ditch to Sparta, where such waters were used for domestic, mechanical, mining and irrigation purposes, but principally for mining purposes. In 1863 water was appropriated and thereafter used through a ditch known as the Hoagum Ditch, and in 1871 ''the Hoagum Ditch was extended to empty its waters into the Sparta Ditch, and was purchased by the owners of said Sparta Ditch at said time.'' The Hoagum ditch has been used as a feeder for the Sparta ditch, and ''especially for the purpose of running water into said Sparta ditch which would be picked up by said Hoagum ditch from the melting snows during the spring thaws, and from the canyons that flowed water during that thaw, and this use was especially made at

a time when the head of the Sparta ditch and of the Hoagum ditch were not thawed out so as to permit the diversion of water from the creek.'' It is about twenty-five miles from the head of the Sparta ditch to Sparta. A tract of about 1,500 acres of arid land is located about six miles from Sparta. The land purchased by the plaintiff is a part of this 1,500-acre tract. The Sparta ditch was at some time extended so as to make water conveyed through it available for use on this 1,500 acres of arid land. Although the record does not inform us as to the time when the Sparta ditch was extended to the 1,500-acre tract of arid land, it does appear that the ditch had been extended and was in use before Campbell purchased in 1917.

In May, 1909, persons claiming the right to use the waters of Powder River and its tributaries filed a petition with the Board of Control (now State Water Board) asking for a determination of the relative rights of all persons to the use of the waters of those streams, and the board subsequently determined to adjudicate the rights of all claimants.

In May, 1913, the Sparta Irrigation Company, a corporation, was organized. According to the resolution duly adopted and recorded in the minute-book of the corporation

''the purpose of organizing this company is to acquire the water rights, ditches and canals of the Sparta and Hoagum ditches or canals to irrigate certain lands of the incorporators of this company for agricultural purposes.''

F. W. Tallmadge, R. L. Boyd, P. T. Wyatt, all owners of lands in the 1,500-acre tract, and R. H. Goodwin subscribed to the articles of incorporation. The amount of capital stock was fixed by the original articles at $30,000. The capital stock was divided

into 500 shares of the par value of $60 each. F. W. Tallmadge, who then owned the 750 acres afterwards purchased by Campbell, subscribed for 251 shares; P. T. Wyatt, 105 shares; R. L. Boyd, 93 shares; and A. S. Boyd, 51 shares. The stock subscription of each was in proportion to the acreage owned by him. The business in which the corporation proposed to engage was, among other things, as declared by the articles of incorporation,

"to operate, buy, lease, locate sell, acquire, procure, hold, and deal in water rights, ditches, flumes, laterals and feeders, canals and in each and every manner concerning water rights * * and more especially in taking water holdings and acquiring them, certain ditches, canals, flumes and water rights commonly known as the Sparta and Hoagum ditches and water right appertaining thereto."

The minute-book recites that the Sparta and Hoagum ditches can be purchased for $30,000, and the issuance of bonds to the amount of $30,000 was authorized. The same resolution which declares that the purpose of organizing the corporation is to acquire the Sparta and Hoagum ditches to irrigate certain lands of the incorporators, also recites that the incorporators are not able to pay the purchase price in cash and "they have agreed to pay the same by negotiable bonds secured by a mortgage or trust deed"; and it is further recited that in order to "satisfy the bond holders" the owners of the land were to convey their lands to the company so that such lands could be included in the trust deed that was to be given as security for the $30,000 bond issue and then the lands were to be reconveyed to the respective owners subject to such trust deed and mortgage "and upon the express condition that such

grantee in each conveyance shall pay his just and proper proportion of the purchase price of said Sparta and Hoagum ditches, lands and water rights.''

In 1912 George Grant, trustee, obtained a judgment against the Oregon Mining and Irrigation Company, a corporation. Subsequently in obedience to an execution issued on that judgment the sheriff sold for $20,443.14 certain mining claims and

''also that certain ditch and water right, known as the Sparta canal, or Sparta Ditch, and the Hoagum Ditch, being a feeder into the Sparta canal, or ditch, and all the lateral ditches, feeders and water rights to said Sparta canal or ditch and to the Hoagum Ditch and all ditches, water rights, easements and franchises appendant and appurtenant or thereunto appertaining to said ditches and water rights aforesaid.''

The sale was confirmed; and based upon the sale and confirmation the sheriff subsequently executed and delivered to the Sparta Irrigation Company a deed dated July 11, 1914, conveying to that company all the placer mining claims, the Sparta and Hoagum ditches and water right. On June 25, 1914, F. W. Tallmadge, P. T. Wyatt, R. L. Boyd and A. S. Boyd, who owned all the stock of the Sparta Irrigation Company, attended a stockholders' meeting and authorized the reduction of the capital stock from $30,000 to $22,500 divided into 500 shares of the par value of $45 each. In October, 1914, the Sparta Irrigation Company gave to the Grand Rapids Trust Company a mortgage to secure bonds amounting to $22,500 issued by the irrigation company. This mortgage covered the arid lands which the stockholders had conveyed to the irrigation company and it also included other property rights.

On September 23, 1916, a stockholders' meeting, attended by all of the stockholders of the Sparta Irrigation Company, was held. One of the objects of the meeting was "to adopt proper certificates of water rights * * to be issued to those entitled to use water out of the ditches of this company," and at that meeting a form of certificate of water right to be issued was by the consent of all the stockholders adopted, and the form was written out in full as a part of the recorded minutes of that meeting.

Employing the form so adopted, the Sparta Irrigation Company issued a certificate of water right to F. W. and L. W. Tallmadge, who then owned the 760 acres subsequently purchased by Campbell, and of which the 160 acres sold by Campbell to plaintiff was a part. The Tallmadge certificate of water right was recorded in the deed records and appears in full in the two abstracts of title received in evidence; and if plaintiff read either abstract she read such certificate. The abstract of July 17, 1917, sets out the certificate as follows:

"CERTIFICATE OF WATER RIGHT.

The Sparta Irrigation Company, a corporation of Oregon,

—to—

F. W. Tallmadge and L. W. Tallmadge.

85 of deeds page 347. Dated Sept. 23rd 1916. Recorded Oct. 20th 1916. Consideration, ownership of shares.

"Recites:—

"This is to certify that F. W. Tallmadge and L. W. Tallmadge, jointly, *by virtue of their ownership of two hundred and fifty one (251) shares of the 500 shares of the capital stock of the Sparta Irrigation Co., are also the owners of 251/500 of the waters of the Sparta Ditch,* owned by said Company and are entitled to the exclusive use and benefit of such 251/500 of such waters of said ditch for the purpose

of irrigating 753 acres of land in the NW. ¼ of
NW. ¼ and the S. ½ of NW. ¼ and the SW. ¼ of the
NE. ¼ and the W. ½ of the SE. ¼ and the SW. ¼
of Sec. 25; and the SE. ¼ and the E. ½ of the SW. ¼
of Sec. 26; and N. ½ of the NW. ¼ and the NW. ¼
of the NE. ¼ of Sec. 36 all in Twp. 8, S. R. 43
E. W. M. in Baker County, Oregon, as adjudicated to
such lands by decree of the Circuit Court, for Baker
County, Oregon, and the State Water Board, subject
however to the following provisions and conditions:—

"1. Said lands may be sold or assigned and con-
veyed, and in such case all the rights and conditions
of this certificate shall pass by any conveyance thereof
as an appurtenant to said lands, unless the owner of
this certificate shall expressly reserve this certificate
from such conveyance, but in no case shall the right
to use any water on or in connection with any other
lands, other than those above described, be permitted
or allowed, except by the express consent of this
company.

"2. In case the ownership of said lands is changed
by conveyances thereof in amounts less than the
whole, then the rights under this certificate shall
attach to each owner of such lands *in the proportion
as his interest therein may bear* to the whole of said
lands, and this certificate may be cancelled and new
certificate issued in like tenor, covering the right to
each owner *in the proportion* to which he be entitled.

"3. *All the expenses in* the upkeep, extending or
*enlarging said ditch,* or in the supervision of the dis-
tribution of the waters thereof, together with all
necessary expenses in the running of said Company,
*shall attach to said land,* and the right to use water
out of said Sparta Ditch as evidenced by this certifi-
cate, and be a lien thereon until paid *in the same
proportion as the number of acres of land above
described bears to the whole number of acres irrigated
out of said ditch,* and the said lien may be foreclosed
in the same manner as liens secured by mortgage on
real property are now foreclosed, and in the case of
such foreclosure a lien for costs and reasonable at-
torneys fees shall also be allowed thereon.

"This remedy is in addition to any other remedy this company may provide in raising funds for the purpose aforesaid, or for any other legitimate purposes.

"4. The Grand Rapids Trust Co. of Grand Rapids Michigan, now has a Trust Deed or mortgage upon said ditch and other lands in the sum of $22,500.00 due Jany 21st, 1925, with interest at 6% per annum payable Jany 1st of each year, and the above described lands for which this water rights is issued, shall bear their share in discharging and satisfying said mortgage, according to its terms, which proportion for said lands above described amounts to the sum of $11,295.00 with interest, and in case of foreclosure, costs and attorneys fees.

"5. This certificate is granted subject to the laws of the State of Oregon and the rules and regulations now in force or which may hereafter be adopted for the government of this company.

"6. This certificate shall be of no force or effect unless signed by the President and Secretary of the said Sparta Irrigation Company, with the seal of the Company affixed, and also accepted by the persons to whom this certificate is issued by the signatures of such persons.

"In Witness Whereof, etc.

"Signed,
"SPARTA IRRIGATION COMPANY,
"By F. W. TALLMADGE, President.
"(Corporate Seal.)
"By R. L. BOYD, Secretary.

"We to whom the above certificate was issued, do hereby accept the same, subject to the terms and conditions thereof.

"Signed, F. W. TALLMADGE.
"L. W. TALLMADGE,"

At the same meeting the stockholders authorized the execution of a supplemental mortgage. It appears that some of the lands in the arid tract of 1,500 acres were not included in the description written in

the mortgage of October, 1914. It was understood that these omitted lands would be conveyed to the Sparta Irrigation Company and then after executing the supplemental mortgage covering such omitted lands, the Sparta Irrigation Company would reconvey the lands, subject to the encumbrances, to the respective owners. This explains the reason for the supplemental mortgage; and we also read in the minute-book *"the object* of same (supplemental mortgage) *being to have all the lands* to which the waters of Sparta ditch have been adjudicated liable and *bear their proportion* of satisfying the $22,500 indebtedness to the said Grand Rapids Trust Company."

At some time, not disclosed by the record, the Sparta Irrigation Company began a suit against Earl F. Cranston and A. N. Ingle, and this suit terminated in a decree which was subsequently, on November 5, 1915, amended; and, in its amended form, it was in substance adjudged that the Sparta Irrigation Company owned the Sparta ditch and is entitled to use it for the purpose of conducting water from the west fork of Eagle Creek to and upon the lands of its stockholders, and that the company

"is also the owner of the right to divert, appropriate and use upon the said lands of the said stockholders, 750 inches of the waters of said stream (west fork of Eagle Creek) the same to be measured and delivered under six inch pressure miner's measurement at the place of the use of the same, and that F. W. Tallmadge and L. W. Tallmadge his wife of said stockholders are to have the use and enjoyment of 376½ inches thereof the same to be appurtenant to the following described lands," describing the lands owned by the Tallmadges.

It is also adjudged "that Maud E. Boyd of said stockholders shall have, use and enjoy 139½ inches

107 Or.—29

of said water as appurtenant to her lands," describing the lands; and like language is applied to Arthur S. Boyd, P. T. Wyatt and W. A. Wyatt the then other stockholders who respectively shall have, "use and enjoy" 76½ inches, 78 inches and 79½ inches "of said appropriation." As a result of the petition which had been filed in 1909 the water board after hearing evidence on November 17, 1915, made and on April 1, 1916, filed with the county clerk of Baker County its findings of fact and order of determination of the relative rights to the waters of Powder River and its tributaries including the west fork of Eagle Creek; and on March 8, 1918, the Circuit Court entered its decree in the Powder River adjudication.

This adjudication involved the consideration of many streams and of a very large acreage owned by many different persons. Of the findings of fact made by the water board, the following are especially applicable to the Sparta ditch. Finding No. 30, so far as it is here material, recites that in 1870 a notice was posted on Eagle Creek appropriating 3,000 inches of water for what is known as the Sparta ditch; that the ditch was completed and water run through it to the town of Sparta on October 14, 1871; and that the appropriation was for domestic, mechanical, mining and irrigation purposes. Finding No. 30 proceeds thus:

"That upon the completion of said ditch, there was *at one time* 800 miner's inches of water delivered to the water users out of said ditch, and the diversion of water into said ditch, *at the time same was used to full capacity, was between 1,000 and 1,500 inches* * * That from the building of said ditch, until 1914, the water of said Sparta Ditch was sold each year by the owners thereof, for the purpose of domestic, mining, power and irrigation use. That beginning with

the year 1915, the owners of said ditch proposed to apply the water from said ditch partly upon the lands described in the tabulation hereinafter, amounting to 1500 acres; that 750 miner's inches of water delivered on the land is sufficient to irrigate the lands proposed to be irrigated. That the change of use of water from sale for domestic, mining, power and irrigation use to an irrigation use, does not infringe upon the rights of any other water users from Eagle Creek, and in making the said change said George Grant, trustee, and the water users from said Sparta Ditch have the right to use a reasonable time for making said change without losing their date of priority. That five years is such a reasonable time and the lands to be irrigated in making such change shall be tabulated herein under the head of inchoate rights.''

Finding No. 30 made by the water board was incorporated, without any material changes, in the decree rendered by the Circuit Court.

In Finding No. 31 made by the water board it is recited that a certified copy of the decree rendered in the suit prosecuted by the Sparta Irrigation Company against Earl F. Cranston and A. N. Ingle was filed ''in these proceedings.''

Finding No. 31 proceeds as follows:

''The said decree found that 750 miner's inches of water, under a six inch pressure, delivered at the place of use, was sufficient water to irrigate the lands of the stockholders of said Sparta Ditch Company. That said Sparta Ditch is 30 miles in length; that the seepage in said ditch would be great. That a reasonable seepage to be allowed said Sparta Ditch would be about 250 miner's inches. That the water master of the district shall allow for seepage in the distribution of water, such an amount as such seepage aggregates, not to exceed 250 miner's inches. That the stockholders and water users of said Sparta Ditch Company are: F. W. Tallmadge, L. W. Tallmadge, Maud E. Boyd, Arthur S. Boyd, P. T. Wyatt and W. A. Wyatt and the land to be irrigated is

described in the tabulation hereinafter set forth under inchoate rights.''

Finding No. 31 made by the Circuit Court sets out a full copy of the decree rendered in the case of *Sparta Irrigation Company* v. *Earl F. Cranston and A. N. Ingle* and it is there declared in the finding that ''the rights of said parties are hereby established in accordance with the decree. That the Sparta Irrigation Company is the successor in interest of George Grant, trustee, and owns the Sparta Ditch.''

Finding No. 31 made by the Circuit Court also declares:

''That said decree found that 750 miner's inches of water, under a six inch pressure, delivered at the place of use, was sufficient water to irrigate the lands of the stockholders of said Sparta Ditch Company''; and the remainder of this finding is identical with that part of the water board finding No. 31 which follows after the words last quoted.

Finding No. 128 made by the Water Board, and confirmed by the Circuit Court, declares that ''the following appropriators have'' applied to the State Water Board to prescribe the time within which the full amount of water appropriated shall be applied to a beneficial use; and it is recited that ''it appears to the said State Water Board that the appropriations of said appropriators'' were initiated prior to February 24, 1909, and that actual construction had been commenced in good faith prior to that date. It is determined that—

''*each of the appropriators* tabulated therein *shall complete their appropriation including the construction work and application of the water* to a beneficial use, on or before the date set in such tabulation as being the limiting date for the complete application of such water to a beneficial use. * * Upon the expiration of said time for the complete application

of the water to a beneficial use * * the State Water Board shall cause due proof to be taken of such application of the water to a beneficial use, and grant such water right certificate as said State Water Board may ascertain that such appropriator is entitled to receive by virtue of such proof.''

It is further stated that—

''the name and address of each appropriator of water from said Powder River and its tributaries, *who has not completed such appropriation,* and who has so applied to the State Water Board to prescribe the time within which the full amount of water shall be applied to a beneficial use, are hereinafter in this finding arranged in alphabetical form, together with the date of relative priority of each of such appropriations, the limiting date for the complete application of the full amount of water appropriated to a beneficial use, the use or uses for which such water was appropriated and is to be applied, the number of acres for which the appropriation was made, and the number of acres now irrigated * * .''

Then follows a table with the names of the appropriators arranged in alphabetical order. The table is arranged with headings. Under the heading ''Description of Land or Place of Use'' are described, so far as material here, thirty-nine separate subdivisions varying from thirty-five acres the smallest, to forty acres, the largest. These subdivisions compose the 1,500-acre arid tract; and among these subdivisions are the four forty-acre subdivisions composing 160 acres conveyed to the plaintiff. Underneath the tabulation of the thirty-nine separate subdivisions we read: ''Of the foregoing lands, the following have been irrigated''; and then follows a list of forty-acre subdivisions with the acreage irrigated. The total irrigated acreage amounts to 178½ acres, of which seventy acres are within the lands purchased by the plaintiff. Omitting all that appears underneath the heading ''Description of Land or Place of Use,'' the

headings and matter appearing underneath them are as follows:

"INCHOATE RIGHTS
Powder River

| Name and P.O. Address of Appropriator | Date of appropriation. | Date of completion. | No. of acres. | Use. | Name of Ditch | Descriptions of land or place of use. |
|---|---|---|---|---|---|---|
| Grant, George (Trustee) Saginaw, Mich. Sparta Irrigation Company, Sparta, Oregon. (Successor in interest) (Finding # 30 & 31) | 1870 | Jan. 1, 1921. (Owned by the Sparta Irrigation Company.) | 1542 | Irrigation Mining & Power | Sparta & Hoagum Ditches | Stream West Eagle Creek Glendenning Creek and all canyons & gulches tributary to the Sparta & Hoagum Ditches." |

The deed received by plaintiff notified her to examine the findings and adjudication of the Water Board. If she made such examination, as she was obliged to do, she found that the Sparta Irrigation Company was the owner of the Sparta ditch, and that the several stockholders "shall have, use and enjoy" a specified quantity of water "as appurtenant to" their specifically described lands. At that time F. W. Tallmadge and L. W. Tallmadge, his wife, were stockholders in the corporation and they owned the lands which Campbell subsequently purchased. The findings advise that the Sparta Irrigation Company owned the Sparta ditch and the right to divert and use upon the lands of its stockholders 750 inches of water and that the Tallmadges "of said stockholders" shall have the use and enjoyment of 376½ inches of such water right. The findings also advise that on October 14, 1871, the ditch was completed and water run through it and that upon the completion of the ditch there was *at one time* 800 inches delivered to the water users and that "*at the time* same was used to full capacity," the diversion from west Eagle Creek was between 1,000 and 1,500 inches. The findings further advise that from the building of the ditch until 1914 the water was used for domestic, mining, power and irrigation purposes; that beginning with 1915 the owners of the ditch proposed to apply the water upon the 1,500-acre tract; and then the Water Board declares that 750 miner's inches delivered on the land is sufficient to irrigate the tract, and a period of five years is allowed for effecting a change of use and applying the water on the lands "tabulated herein under the heading of inchoate rights." The findings do not declare that the then carrying capacity of the ditch was 750 inches or more. It is true the recital is

that "there was at one time 800" inches of water delivered to the water users, but this is only another way of saying that the ditch was not then carrying that quantity of water; and the recital that "the diversion of said water into said ditch at the time same was used to full capacity, was between 1,000 and 1,500" inches is only another way of saying that at the one time when the ditch carried 800 inches it was carrying its then full capacity and that to get a greater quantity at the place of delivery it was necessary to divert between 1,000 and 1,500 inches from west Eagle Creek. The board limited the quantity of water thereafter to be used by the owners of the 1,500-acre tract by finding that 750 inches were sufficient for the irrigation of the whole tract, and then on the basis of one-half inch per acre the board found that the Tallmadges and the other stockholders were each entitled to "have, use and enjoy" a specified number of inches of water of the water right. Finding No. 30 declares that the Sparta Irrigation Company has the right to deliver 750 inches of water to its stockholders, but it does not declare directly or impliedly that 750 inches were then being delivered to the users.

If we pass to finding No. 123, we observe that this finding involved the idea that 750 inches were not then being conveyed through the ditch and used. Finding No. 128 opened with the recital that the "following appropriators have" applied to the board "to prescribe the time within which a full amount of water appropriated shall be applied to a beneficial use," and it appearing to the board that the appropriation of each of such appropriators was initiated prior to February, 1909, and that actual construction work was commenced in good faith prior to that

date, and then it is ordered that each of the appropriators tabulated shall complete his appropriation including the construction work and application of the water to a beneficial use on or before the date fixed for such application. Although the finding declares that the Sparta Irrigation Company has the right to deliver 750 inches of water to its stockholders it is made plain that that quantity was not being delivered and could not be delivered at that time.

The findings and adjudication of the water board gave the names of the stockholders and described the lands owned by them respectively. The right to deliver 750 inches is adjudged and of that right each stockholder shall have the use of a specified quantity of water based upon the number of acres owned by each stockholder.

Mrs. Harvey knew when she received her deed that she was also to receive as a part of the transaction 53⅓ shares of the capital stock of the Sparta Irrigation Company, and this fact makes it necessary to inquire into the surrounding circumstances. Indeed, it is impossible to appreciate the situation of the parties or adequately to understand the controversy unless all the circumstances are known.

The Tallmadges by a deed dated November 1, 1916, conveyed all the lands owned by them, being "760 acres more or less," to Robert N. Warnock,

"together with all the water and ditch rights thereunto appurtenant * * said water right being in the amount of 376½ inches of water, measured under six inch pressure out of the Sparta Ditch."

Warnock by a deed dated July 30, 1917, conveyed to Campbell the "760 acres more or less" and

"also that certain water right to the amount of 376½ miner's inches of water measured under six inch pres-

sure, taken out of what is known as the Sparta Ditch in Baker County, Oregon, as such water right is measured and defined by the State Water Board of the State of Oregon on the 17th day of November, 1915, in its findings of fact for an adjudication of the rights of the various claimants to the waters of Powder River; and also a *pro rata* share of not to exceed 250 miner's inches of water allowed in said decree in the discretion of the water master for and on account of seepage.''

This conveyance is subject to the $22,500 mortgage held by the Grand Rapids Trust Company and it is recited in the deed that the amount of such mortgage apportioned to the Warnock land is $11,295, and that upon the payment of that sum with interest the Warnock land will be released from the mortgage. The payment of the portion of the encumbrance so apportioned was assumed by Campbell.

By a deed dated October 8, 1917, Campbell and wife conveyed 160 acres of the land to Mary C. Harvey. The grantors covenant that they are the owners in fee simple of the premises and that the land is free from encumbrances except the mortgages held by the Grand Rapids Trust Company "of which said mortgages so recorded and now an encumbrance and lien against said property the grantee herein assumes and agrees to pay her *pro rata* share thereof hereby fixed and agreed to be the sum of $2,400 with interest thereon.''

The 760 acres which the Tallmadges owned were by them conveyed to Warnock together with 251 shares of the capital stock of the Sparta Irrigation Company; Warnock transferred all the land and all the stock to Campbell; and Campbell conveyed 160 acres of the land and assigned 53⅓ shares of the stock to plaintiff. When Campbell purchased, less than 750 inches were being delivered by the ditch, and

the quantity delivered was prorated among the water users. During the season of 1918 and 1919 less than eighty inches of water was delivered to the Harvey land except when the water was rotated between the Campbell and Harvey lands, and yet plaintiff did not assert an absolute right to eighty inches until the fall of 1919 and after Wheeler had learned that he could not lease the Campbell land for another year.

Campbell's home was in Portland. He had been acquainted with S. S. Wheeler since 1909. Soon after Campbell purchased from Wheeler he wrote to Wheeler about a certain business matter, and as a result of that letter Wheeler called upon Campbell at the latter's Portland home. On that occasion Campbell informed Wheeler that he had purchased "an irrigated tract of land." Campbell also told Wheeler that he did not know anything about irrigation and that he needed somebody who did know about it. Wheeler had had much experience in irrigated lands, and the uncontradicted evidence is that he was an expert irrigationist. An understanding was reached whereby Campbell was to pay Wheeler and his wife $60 a month "for the balance of the fall" and Campbell was to furnish everything at the ranch.

Wheeler and his wife arrived at the Campbell ranch about noon on August 13, 1917. The next morning Wheeler took charge of the irrigation and thereafter retained charge of it so long as he was on the Campbell ranch. After Wheeler and his wife had been there "a couple of weeks" Mrs. Wheeler wrote to her two sisters, Mrs. Mary C. Harvey and Mrs. Flora Dunne, and invited them to visit with her and her husband. The two sisters accepted the invitation and arrived at the Campbell ranch about the middle of September. Soon after their arrival the plaintiff

and Mrs. Dunne became interested in the idea of buying portions of the Campbell ranch. Finally, on October 8, 1917, the plaintiff, together with Campbell and Mr. and Mrs. Wheeler, drove to Baker and went to the office of James H. Nichols, a lawyer, and had him prepare the deed. Nichols was the attorney for the Sparta Irrigation Company and was familiar with the history of the ditch. The plaintiff paid $1,000 in cash and gave three notes for $3,000 each and one note for $2,000. All the notes have since been paid in full. In this connection it is appropriate to state also that Mrs. Dunne purchased 160 acres from Campbell; but, not being able to complete her payments, she requested Campbell to take the land back and return to her the moneys which she had paid, and he did so. It was understood that if the plaintiff purchased she would lease her land to Wheeler and that Campbell would likewise lease the remainder of his land to Wheeler; and accordingly when the plaintiff purchased she and Campbell leased their respective properties to Wheeler, and thus Wheeler had control over all the water available for use on those lands during the irrigating season of 1918. The Campbell lands were farmed by a son of Wheeler's in 1919; and S. S. Wheeler, who continued as lessee of the Harvey land until the time of trial, managed the distribution of the water on the Harvey and Campbell lands during the irrigating season of 1919. In the fall of 1919 Campbell made it known that he would not lease his land to Wheeler any longer; and instead of renting to Wheeler he rented to William Long for the year 1920.

When Campbell purchased from Warnock the capacity of the Sparta ditch was less than 500 inches. The water-master of Baker County in 1920 measured

the water going into the Sparta ditch at its head
and found the amount to be 621 inches, and in his
language

"we figured at that time after we walked to the head
of the ditch it was about as full as the ditch would
carry in safety.  Some places an additional increase
of water might have damaged it by cutting out the
banks";

and when the ditch was receiving at its head its full
capacity not more than 380 inches at the most were
running in the ditch at the road crossing near Sparta,
a point about twenty-five miles from the place of
diversion, and about five miles above the 1,500-acre
tract.  Although the ditch was cleaned out nearly
every year, if not every year, its carrying capacity
was less in 1917 and afterwards than at or near the
time when it delivered 800 inches.  January 1, 1921,
was the time limit fixed for the completion of the
appropriation for the 1,500-acre tract; and so in the
late summer or fall of 1919 the stockholders of the
Sparta Irrigation Company met at the Campbell
ranch in an attempt to hold a special meeting for the
purpose of authorizing the enlargement of the ditch
within the prescribed time so as to restore the ditch
to its former carrying capacity and thus enable the
delivery of 750 inches to the 1,500-acre tract.  The
plaintiff and Mrs. Dunne refused to sign waivers of
notice and also declared that they would not help to
pay for enlarging the ditch so as to restore it to its
former carrying capacity.  Subsequently the stock-
holders of the corporation authorized the improve-
ment of the ditch, and the work was then done; but
the plaintiff refused to pay any assessment for such
work, because she contended that her deed obliged
Campbell to pay the whole of such assessment.

In substance the plaintiff says that soon after her arrival at the ranch Campbell "began to talk to me about buying land," and that notwithstanding she told him that she did not wish to purchase any land, he kept on describing his farm and telling of its advantages and the good soil and abundance of water and the good water right. Campbell, the Wheelers, the plaintiff and Mrs. Dunne occupied the ranch house and consequently were together much of the time; and naturally these persons are the main sources of information as to what was said in the different conversations which occurred prior to the execution of the deed, at the ranch house, at the diverting dam a short distance above the house and at the road crossing near Sparta. The plaintiff, defendant, the Wheelers and Nichols are the sources of information as to what occurred when the deed was executed on October 8th.

It is conceded by all that during several conversations at the house calculations were made by the defendant or in his presence as to what the lands proposed to be sold to the plaintiff could raise. Wheeler appears to have agreed with the calculations, but he claims that he qualified his approval by saying that the calculated quantities could be raised if there was as much water as Campbell claimed there was. The testimony on behalf of plaintiff is that on numerous occasions Campbell told plaintiff that the ditch was one of the best ditches in the state, that it was the best water right in the state, that the court had decreed 750 inches of water to the 1,500-acre tract of land.

"and that would be a half inch per acre for all the irrigable land, that this water was to be delivered on the land, that there was plenty of water."

Reviewing what took place in Nichols' office on October 8th the plaintiff said:

"When the deed was brought in Mr. Nichols read it to us and I asked particularly about the half inch of water per acre. Then he showed me the deed, that it said 80 inches of water per acre for the land, and I said, what does that mean? And it was explained that this meant just the same as the half inch per acre, and that that meant every year for the irrigation season. I asked that particularly and Mr. Campbell and Mr. Nichols both concurred with that."

The plaintiff says in substance that she understood when she bought that the ditch was entitled to carry and that it was carrying 750 inches of water and that she would receive eighty inches of water delivered on her land without any cost to her except the expense of upkeep which Campbell estimated would be about $85 per year; and she also says that the first she heard of the necessity of enlarging the then carrying capacity of the ditch so as to enable it to carry 750 inches was in September, 1919, shortly prior to the attempted stockholder's meeting previously mentioned; but Wheeler, who says he can look at a ditch and make a "pretty close" estimate of the amount of water in it, testified, when a witness for plaintiff, that in the spring of 1919 he told plaintiff "that the ditch wasn't sufficient for the water."

The defendant in substance says that plaintiff knew that the ditch was not carrying 750 inches and that before it could carry that amount of water it would be necessary to enlarge the ditch; that it was known that the water then coming through the ditch was prorated and that it would continue to be prorated among the stockholders of the company and owners of the 1,500-acre tract so long as less than

750 inches was delivered, and that it was understood by all concerned, not that Campbell was selling a definite, certain and fixed quantity of water to be delivered at all events each irrigating season, but that he was selling with the land an appurtenant water right which would entitle the plaintiff to receive a maximum of one-half inch per acre or a total of eighty inches just as Campbell was entitled to receive a maximum of one-half inch per acre for the remainder of his land, and that if the maximum allowance was not available the right of each owner being equal in dignity to the right of every other owner, all would be obliged to share in the water deliverable in proportion to their acreage. There is testimony to support plaintiff, and so, to, there is testimony to support the defendant. The trial judge who saw the witnesses and heard them testify was in a far better position than this court can possibly be properly to appraise all the conflicting testimony. The trial court expressly found "that said parties knew" that the ditch was not in such condition as to carry .750 inches "and knew the status of the title to said ditch and water right"; and knew that the method of distribution was to furnish to each stockholder

"such proportion of the entire flow in said ditch as the shares of the capital stock such stockholder held bore to the whole number of shares of said capital stock, and that said corporation was invested with title to said ditch and water right for the purpose of holding the same for the benefit of said stockholders and to manage the same and to distribute the waters to and among said stockholders, each to be entitled to and receive of said water in accordance with the number of shares of capital stock held by each respectively as aforesaid."

The trial court also expressly found:

"That said parties to the aforesaid deed knew of said certificate and of the rules and regulations under which said Sparta Irrigation Company was obligated to distribute the waters flowing in said Sparta Ditch; and that said plaintiff accepted and retained the said shares of capital stock so delivered and assigned to her, and became one of the directors of said corporation, and served as its secretary and participated in its meetings and availed herself of the benefits accruing to her by virtue of being such stockholder; and that ever since said plaintiff became such stockholder she has, like the other stockholders, received and accepted from said corporation the same proportion of the total flow of water in said Sparta Ditch as the number of shares of capital stock held by her bears to the total issue, all in conformity with said rules and regulations and as in said certificate provided; and that said corporation distributed said water continually to each of said stockholders, including the said plaintiff Mary C. Harvey and said defendant Floyd J. Campbell, *pro rata* according to the number of shares held by each stockholder respectively, and under which system the said plaintiff received 53 and $\frac{1}{3}$ five-hundredths as owner of 53 and $\frac{1}{3}$ shares of said capital stock, and said defendant received 197 and 2/3 five hundredths as owner of 197 and 2/3 shares of said capital stock."

These findings of the trial court, although contradicted by testimony in behalf of plaintiff were nevertheless based upon substantial evidence offered in behalf of defendant. Plaintiff does not charge Campbell with having made false representations concerning the water; but upon the contrary she states in her printed brief that Campbell really thought that there were 750 inches actually in the ditch and that he was therefore honest in his alleged assertions that there were 750 inches actually in the ditch and available for use. When all the record is examined,

107 Or.—30

it seems to the writer that the conclusion must be that Campbell either deliberately falsified and represented that 750 inches were in the ditch or could be turned in, or else he told the absolute truth and represented that the ditch was carrying less than 750 inches, because the evidence shows conclusively that Campbell knew that the ditch did not carry and could not carry 750 inches. A day or two before the arrival of the Wheelers, Campbell, accompanied by Ray Boyd and Mr. Wyatt, went to the end of the ditch, walking part of the way along the ditch and part of the way viewing the ditch from an automobile as they rode along a road paralleling the ditch at different places. On their return from the head of the ditch, Wyatt measured the water at three different places and figured that the ditch was carrying about 500 inches at the places of measurement; and Boyd and Wyatt and Campbell estimated that it would cost about $4,000 to enlarge the ditch sufficiently to carry 750 inches.

Before Campbell purchased he received an abstract of title and submitted it to Charles A. Johns, then a practicing lawyer in Portland, afterwards a member of this court, and now a member of the Supreme Court of the Philippines; and Campbell says that Judge JOHNS rendered a written opinion upon the abstract of title and at the same time orally informed Campbell that he had been over the whole length of the ditch and that the ditch would have to be enlarged before it could carry 750 inches; and, furthermore, Campbell says that Tallmadge told him that it would be necessary to enlarge the ditch to carry 750 inches of water. In this connection it is important to remember that Campbell testified that Judge JOHNS also "warned me not to state any definite amount" of water whenever he sold any of the land but that a

deed patterned after "the others before it" would protect Campbell's interests. Wyatt is dead. Ray Boyd, an apparently credible witness, corroborates Campbell and says that the measurements referred to by Campbell were made in August, 1917, by dropping a twig at one end of the flume and timing its progress, and that 500 inches was the estimate. One measurement was about three miles while the other was about eight miles from the head of the ditch.

The plaintiff S. S. Wheeler was an important witness. He testified in substance that Campbell represented to Mrs. Harvey that there was plenty of water, that the ditch was large enough for the water, that she would have one-half inch per acre, and in his language "there was no question in any of our matters about the scarcity of water." Wheeler says that he did not know prior to October 8, 1917, whether the ditch was large enough to carry 750 inches, that he did not talk with Mrs. Harvey about whether the ditch would carry 750 inches, that he did not at any time advise Mrs. Harvey regarding the water right or the sufficiency of it, and that he did not recommend to Mrs. Harvey that she buy the land. It is claimed in behalf of the plaintiff Harvey that she did not ask Wheeler "about any information regarding the land or the water," and that Wheeler made no statement concerning the water except to the effect that if there is plenty of water as Campbell says there is "I can raise a good crop on the land." It must be remembered that we are now trying to ascertain whether plaintiff knew that the ditch was not carrying 750 inches of water and whether she knew that the water users had been prorating according to their stock holdings, because the fact of her knowledge or lack of knowledge upon the subject is a material

factor in determining the intention of the parties to the deed. Any deduction that may be drawn from Wheeler's testimony cannot be destroyed or shunted from the case by declaring that Wheeler was Campbell's agent and that Campbell is responsible for Wheeler's declarations, because that question is not here. Wheeler was admittedly the only person on the Campbell ranch who knew anything about irrigation. The substance of Mrs. Harvey's testimony is that she was very much concerned about whether there was sufficient water for the land and that before purchasing she was careful to obtain assurances from Campbell with reference to the water, and yet it is said that she did not ask Wheeler for information regarding the water notwithstanding she had no knowledge of irrigation and notwithstanding she knew that Wheeler did have such knowledge.

The plaintiff Wheeler was materially interested in a sale. It is admitted that Campbell told Wheeler that he wished to sell his land and that a few days after Wheeler's arrival he promised Wheeler a commission of $5 per acre if Wheeler would sell all or a portion of it. Wheeler wrote to two persons about the land but neither of them could be interested. However, Campbell says that when he made the offer to Wheeler the latter "said if he couldn't sell it all that the girls, he called them the girls, Mrs. Harvey and Mrs. Dunne, he was sure he could sell them each a hundred and sixty acres." It is a significant fact that Mrs. Wheeler testified that in her letter requesting her sisters, Mrs. Harvey and Mrs. Dunne, to pay her a visit she stated that Campbell "had an immense lot of land and was trying to sell some of it"; and that they answered saying "we don't want to buy any land, but we will come over." It is conceded

that Wheeler received from Campbell a commission of $1,600 or $5 per acre for the 160 acres sold to Mrs. Harvey and for the 160 acres sold to Mrs. Dunne. It is also a noteworthy fact that Mrs. Harvey did not know that Wheeler was to have or that he had received a commission until long after the execution of the deed, and that Mrs. Dunne did not have such knowledge until "a year or two afterwards."

In addition to what Campbell says he told Wheeler about the carrying capacity of the ditch there is the testimony of Arthur Boyd and Ray Boyd both of whom were users of water out of the Sparta ditch in 1917, and both of whom are apparently credible witnesses. Arthur Boyd explained about Wheeler looking at his place in September, 1917, with a view of selling it for Boyd, and that in the course of the conversation, during all of which Ray Boyd was present and during part of which Campbell was present, Arthur Boyd told Wheeler "I thought we had one of the best water rights in the country when we enlarged our ditch so that we could get more water, get the water the state allowed us, and he said that if we would use our water properly at that time that he believed we had plenty to raise good crops with."

Referring to this same conversation Ray Boyd testifies as follows:

"So we went up over the place to show him, Mr. Wheeler, Arthur's place, and we were telling him about what a good water right we had, a good clean water right that went through the courts and we had stipulated with the other users of the stream that used water from the same stream and thought that our water right was beyond reproach, and although we were not getting a half inch of water as we were entitled to and wouldn't until we enlarged our ditch,

and he said that if we used the water properly that he believed we could irrigate all the land under the ditch at that time with the present head of water."

Campbell insists that prior to the sale to Mrs. Harvey he submitted an abstract of title to her and that she examined it. Two abstracts were received in evidence: One was prepared on July 17, 1917, and the other on December 6, 1917. Each one of the abstracts contains a copy of the certificate of water right issued by the Sparta Irrigation Company to F. W. and L. W. Tallmadge. When Campbell purchased from Warnock he received the abstract of July 17th, and this is the one which Judge JOHNS examined. Campbell agreed to give an abstract with the deed to Mrs. Harvey, and the abstract of December 6th was prepared in compliance with that agreement and delivered to Mrs. Harvey about December, 1917. Campbell testified that during the negotiations at the ranch Mrs. Harvey asked him if he would furnish an abstract and he told her he would and he says that he told her that he had one with him, and that thereupon he gave her the abstract of July 17th and that she took it and examined it and asked questions about it for three or four days. Campbell says that in addition to this abstract he gave to Mrs. Harvey for her examination the written opinion rendered to him by Judge JOHNS and also a written opinion rendered by Nichols to Warnock.

Nichols says that when the parties came to his office on October 8, 1917, they had the abstract and also the Johns and Nichols written opinions and that "those instruments were the subject of discussion between us." Referring to the abstract, Nichols declared:

"My recollection is, and in fact I am confident that this is true, that Mrs. Harvey had examined this abstract and that she had also examined my written opinion of title which accompanied it at that time and the opinion of title to the land and also to the water right furnished to Mr. Campbell by Charles A. Johns. I recall that particularly because of the fact that Mrs. Harvey expressed to me in that conversation her satisfaction with the title to the land, and that came about as I recall it, at least I got the impression from Mrs. Harvey that that was purely by reason of the fact that she had examined this abstract and the opinions of title to which I have referred."

If it be claimed that the testimony of Nichols is weakened because he used the word "recollection," and the like, the answer is that in cross-examination he explained: "I have tried to be definite and only testify to what I positively knew." In considering whether Mrs. Harvey received and examined an abstract before purchasing, it must not be forgotten that she was making an investment of $14,400, and that she admits that she "asked that he would furnish me an abstract"; and that she was not without business experience, for she had wheat lands in Umatilla County and had managed that property since 1909, the date of the death of her husband.

Campbell insists that he explained to Mrs. Harvey that it had been estimated on the trip with Boyd and Wyatt to the head of the ditch a day or two before the arrival of the Wheelers that only about 500 inches were coming through the ditch; and Campbell also insists that Wheeler "said right there at that time that there was enough water to water all of the land if they never got any more if it was judiciously handled." Campbell asserts that he told Mrs. Harvey that only about two thirds as much water as

they were entitled to receive was coming down the ditch and that the ditch could be enlarged so as to carry the full amount to which they were entitled for about $4,000. Campbell further testified that at his house at the ranch and prior to the sale Mrs. Harvey

"wanted to know what proportion of the water she was entitled to, and I told her that she would receive with this deed 53⅓ shares of stock in the Sparta Irrigation Company which would represent her interest in that company and it would entitle her to fifty-three and one-third five hundredths of the property of the ditch company and fifty-three and one-third five hundredths of the water coming down or through the ditch at any time."

Nichols testified that on October 8th he explained to Mrs. Harvey, to Campbell, and to the other persons present, his interpretation of the findings and order of determination of the State Water Board and of the decree of the Circuit Court based upon that order "with particular reference to the fact that certain work must be prosecuted on that ditch within the period of five years from the date of the order of determination." Referring to the certificate of water right Nichols further testified:

"In the course of our conversation that day in the office and in connection with Mrs. Harvey's questions to me concerning the water right, reference was made to the certificate of water right which is set forth in this abstract on pages 2 and 3 of the first continuation thereof. I do not recall whether Mrs. Harvey brought this matter to my attention or whether Mr. Campbell spoke of it or whether I took it up and called it to the attention of Mrs. Harvey, but it is my best recollection that this certificate of water right was discussed and particularly that provision of this certificate which recites that each of the shares of stock in the Sparta Irrigation Company, a corporation, en-

titled the holder to a proportionate interest in the water available in the Sparta Ditch.''

Campbell says, and Nichols corroborates him, that ''due to the instructions that Mr. Johns gave me,'' he told Nichols to make the deed ''the same as the one that Mr. Warnock had given me''; that Nichols ''said to be sure about it'' he would go to the courthouse and get an exact copy. Nichols declares that he did go to the courthouse and ''took my note-book''; and he further testified ''if there is any mistake in this matter it is my mistake with regard to making that transcript, because the parties understood what they wanted.''

Regular meetings of the stockholders of the Sparta Irrigation Company were held on February 4, 1918, and on February 4, 1919. The minutes of both meetings were recorded in the minute-book by Mrs. Harvey, who was the secretary-treasurer of the corporation. The evidence does not disclose whether or not a meeting of the stockholders was held in 1917. There are four blank pages between the recorded minutes of the meeting held Sepember 23, 1916, and the meeting of February 4, 1918; and this fact suggests the possibility that a meeting was held and space was left for recording the minutes. However, the minutes of September 23, 1916, contain a copy of the form of certificate of water right adopted by the Sparta Irrigation Company and to be issued ''to each party entitled to water from said company.'' The minutes of the meeting of February 4, 1918, recite: ''The minutes of the last meeting were read and approved''; and therefore if the 1916 meeting was the last meeting preceding the 1918 meeting the certificate of water right was either read by Mrs. Harvey or it was read in her presence and hearing

at the February 4, 1918, meeting. Nichols testified thus:

"At both the meeting held in February, 1918, and in February, 1919, I urged the stockholders and directors of the Sparta Irrigation Company to proceed with the work of the improvement and enlargement of the Sparta Ditch, advising them of the fact that this work must be completed on or before the fall of 1920, and that it was necessary that this work be completed and proof of its completion made before the State Water Board in order to preserve and protect the full right of the Sparta Ditch";

and Nichols further testified that Mrs. Harvey entered "into those discussions" and made no objection or remonstrance. At the February 4, 1919 meeting the stockholders were considering the advisability of entering into a contract with a contemplated irrigation district, whereby the district, if established, could use the Sparta ditch. The contention of Campbell is that all the stockholders present knew that the ditch must be enlarged so as to restore its former carrying capacity and so as to enable it to deliver 750 inches of water, and that it was suggested that the company could secure the necessary enlargement without expense to its stockholders by permitting the proposed district to use the ditch for carrying its water in consideration of the payment by the district of the expense of enlargement. The minutes written by Mrs. Harvey recite that:

"The Co's attorney advised that an effort should be made to have the Irriga District, as a part of the consideration for the use of the Co ditch by it, concede after enlargement the prior right of the Co to the use of the waters therein to the extent, of the amount awarded to said Co by the circuit court of Baker Co Oreg; *without regard to the present or past carrying of said ditch.*"

Campbell declares that at the 1919 meeting the fact that the ditch was carrying less than 500 inches at Sparta was discussed and that the plan to improve the ditch was approved by Mrs. Harvey. Ray Boyd says that at the 1919 meeting Nichols spoke of the necessity of enlarging the ditch. Ernest Dill testified to the same effect. J. P. Thrasher testified that after he "bought in" Nichols "generally always" urged the enlargement and improvement of the ditch.

It is claimed that the use of the term *"pro rata"* in connection with the maximum of 250 inches allowed for seepage and loss in transit, and the failure to use that term in connection with the eighty inches, strongly supports the theory of plaintiff. No one has been so bold as to claim that the deed from Warnock to Campbell operated as an absolute conveyance of a definite and fixed quantity of water or that it conveyed anything more than the water right appurtenant to the 760 acres of land, and yet in that deed the term *"pro rata"* is used only in connection with the 250 inches allowed for seepage and loss in transit. The water board fixed 250 inches as the maximum allowance and if less than that quantity is sufficient to enable the delivery of 750 inches only such less amount can be added; and consequently it was peculiarly appropriate to use the term *"pro rata"* in describing an interest in a part of such maximum allowance. The use of the term *"pro rata"* in the Harvey deed in connection with the 250 inches is of no more evidentiary value in support of the plaintiff's contention than such use in the Warnock deed would have in support of any claim that Warnock conveyed 376½ inches of water rather than a water right appurtenant to the land under which he was entitled to use 376½ inches.

In 1917 after Campbell purchased, the ditch was carrying at full capacity between 375 and 380 inches. Campbell thought that it was carrying 500 inches when he conveyed to Mrs. Harvey and it may be fairly assumed that he was of that belief when he sold to Mrs. Dunne, and that he had not yet learned that the ditch was not carrying more than 360 inches. It must be remembered that the plaintiff does not charge that Campbell made any false representations about the carrying capacity of the ditch or about the amount of water in it, for the most that is claimed is that he honestly believed that the ditch was carrying or could carry 750 inches, and acting on that belief made the alleged statements; and it must be remembered that Campbell knew that it had been estimated that the improvement would cost $4,000. Out of the 500 inches supposed to be coming through the ditch Campbell was entitled to 251 inches. If he sold eighty inches to Mrs. Harvey and eighty inches to Mrs. Dunne for the irrigation of an aggregate of 320 acres he would have had left out of the supposed 251 inches only ninety-one inches for the irrigation of 440 acres. It is not to be supposed that he would have done that.

The following facts are either admitted or conclusively proved by the evidence. The owners of the 1,500-acre tract formed a corporation for the purpose of buying the Sparta ditch and water right so that they could irrigate that land. They subscribed for corporate stock in proportion to the number of acres owned by them. In order to obtain money with which to buy the ditch the owners of the land conveyed the land to the corporation so that it could mortgage the land. A mortgage was given and then the corporation conveyed the land back to the owners subject to

the mortgage. In this mortgage was a provision enabling any owner by paying his *pro rata* part of the mortgage to have his land released from the mortgage. The stockholders provided for the issuance of a certificate of water right to each owner of land and holder of stock; this certificate was based upon the proportion of stock ownership and the stock ownership was in turn based upon the proportion of land ownership. A certificate of water right was issued to the Tallmadges by virtue of their ownership of the 760 acres afterwards acquired by Campbell, and this certificate was accepted and agreed to by the Tallmadges and recorded by them. The capacity of the Sparta ditch in 1917 was only about 380 inches, although at least three of the water users including Campbell believed that the ditch was carrying 500 inches. The Sparta Irrigation Company was given until January 1, 1921, to utilize the full allotment of 750 inches for the 1,500 acres, and in order to make use of that quantity of water it was necessary to improve the ditch so as to restore it to its former capacity. Prior to the sale to Mrs. Harvey the water coming through the ditch was prorated among those entitled to water; and the water continued to be prorated after the purchase by Mrs. Harvey. The plaintiff Harvey knew when she purchased that she was to receive as a part of the transaction 53⅓ shares, or a *pro rata* part, of the capital stock of the Sparta Irrigation Company; and that number of shares was assigned to her and voted by her at the stockholders' meetings of February 4, 1918, and February 4, 1919. The duties and obligations as well as the rights of the water users were from the beginning and at all times prorated. The trial court found that Mrs. Harvey knew all these facts.

The findings of the trial court were for the defendant as to all of the disputed questions of fact; and although the evidence is conflicting, the court resolved the conflict in favor of the defendant. There was an abundance of evidence to support the conclusion reached by the trial court. That court was in a far better position than this court properly to appraise the testimony. When the deed is read in the light of the findings and order of the water board, of the fact that as a part of the purchase plaintiff knew that she was to receive her *pro rata* part of the capital stock of the corporation, and of the surrounding circumstances as found by the trial court, it becomes clear, it seems to the writer, that the parties intended to do by the deed exactly what defendant claims they intended to do.

The decree ought to be affirmed.

Rand, J., not sitting.

McBride, C. J., concurs in the dissent.